# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-2174

_____

American Family Mutual Insurance Company; American Family Life Insurance Company; American Standard Insurance Company, Wisconsin corporations

*Plaintiffs - Appellees*

v.

Steven G. Graham, a Minnesota resident; Steven Graham Agency, Inc., a Minnesota corporation

*Defendants - Appellants*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: February 10, 2015
Filed: July 7, 2015

_____

Before GRUENDER, SHEPHERD, and KELLY, Circuit Judges.

_____

KELLY, Circuit Judge.

Steven Graham and his insurance agency, Steven Graham Agency, Inc. (collectively Graham), appeal the denial of Graham's post-trial motions and the

district court's[1] enforcement of a stipulated-damages clause in Graham's Agent Agreement with American Family Mutual Insurance Company (American Family). We affirm the judgment.[2]

## I. Background

Graham sold insurance for American Family from 1988 until 2011. On January 1, 1996, Graham and American Family entered into an American Family Corporate Agent Agreement (Agent Agreement). In 2010, a customer complaint led to an investigation of Graham. American Family concluded that Graham had increased coverage and added endorsements on customers' insurance without customer permission, thereby increasing premiums; improperly applied multi-vehicle discounts to accounts with only one car; and changed vehicle-rating symbols used to assign risk and determine appropriate premiums for automobile insurance. On January 7, 2011, Austin Caves, Graham's state sales director, met with Graham and terminated the Agent Agreement between Graham and American Family.

Several weeks later, Graham formed an independent insurance agency. On February 24, 2011, Graham sent a letter to approximately 1,500 of his former American Family customers telling them he no longer represented American Family Insurance Company and had signed an Agent Agreement not to solicit or induce former customers for one year. According to the letter, however, this Agent Agreement did not prohibit him from offering policies for insurance needs not covered by an existing American Family policy. In the letter, Graham stated he now represented over 50 insurance companies and could offer clients "more choices,

---

[1]The Honorable Michael J. Davis stepped down as Chief Judge of the United States District Court for the District of Minnesota at the close of business on June 30, 2015.

[2]We have jurisdiction pursuant to 28 U.S.C. § 1291.

expanded coverage, and excellent rates" that might be "better suited for your needs." The letter concluded by inviting customers to view his new insurance agency's website. If a former customer contacted Graham in response, the customer was asked to sign a "non-inducement form," which stated that Graham had not "solicit[ed] or induc[ed]" them "to replace, lapse or cancel any American Family Insurance policies" during the one-year, non-compete period.

In 2012, American Family sued Graham in federal court. American Family alleged that Graham violated the Agent Agreement when he sent the February 2011 letter to his former customers because the Agent Agreement expressly prohibited Graham from inducing or attempting to induce any former American Family customer to cancel an American Family policy for a year after leaving American Family. As damages, American Family sought all of Graham's extended earnings.[3] At the time of his termination, Graham's extended earnings amounted to approximately $938,000. American Family had paid Graham $523,153.70 prior to filing suit.

Graham counterclaimed for wrongful termination. He alleged the Agent Agreement required American Family to give him "notice in writing of any undesirable performance which could cause termination of [the] agreement if not corrected" and to wait six months after such notice before terminating the agreement. American Family had given no notice to Graham before the termination. According to the Agent Agreement, however, if Graham engaged in "dishonest, disloyal, or unlawful conduct," no notice was required. American Family asserted that Graham's conduct qualified as "dishonest," obviating the need for notice under the Agent Agreement.

---

[3]Section 6.u of the Agent Agreement provided for a "forfeiture of extended earnings" if an agent failed to comply with any clause of the agreement, particularly the non-inducement clause. Extended earnings are a form of deferred compensation provided by American Family to an agent after an Agent Agreement is terminated, usually by the agent retiring.

The case was tried before a jury in October 2013. The jury found in favor of American Family on all claims. Graham moved for judgment as a matter of law (JMOL) and a new trial. The court denied the motions and entered judgment in favor of American Family. In addition, the court ordered Graham to repay the $523,153.70 in extended earnings, plus interest, that American Family had already paid him. Graham timely appealed.

## II. Discussion

## A. Sufficiency of the Evidence

Graham asserts the district court erred in denying JMOL in his favor on American Family's breach-of-contract claim because the evidence was insufficient to support the jury verdict. According to Graham, the Agent Agreement did not prohibit him from contacting former customers or selling insurance policies to them so long as the customers understood he was not "inducing" them to cancel American Family policies.

"We review de novo the district court's denial of a motion for judgment as a matter of law, using the same standards as the district court." Howard v. Missouri Bone and Joint Center, Inc., 615 F.3d 991, 995 (8th Cir. 2010). In diversity cases, our court has at times applied the forum state's standard of review to sufficiency of the evidence challenges. See In re Levaquin Prods. Liab. Litig., 700 F.3d 1161, 1165 (8th Cir. 2012) (applying Minnesota Rule of Civil Procedure 50.01(a)). At other times, we have applied the federal standard of review. See Weitz Co. v. MH Washington, 631 F.3d 510, 519–20 (8th Cir. 2011) (applying Federal Rule of Civil Procedure 50(a)(1)). Here, however, Minnesota Rule of Civil Procedure 50.01(a) and Federal Rule of Civil Procedure 50(a)(1) provide virtually identical standards, so we need not decide which standard applies for purposes of this case. See Carper v. State Farm Mut. Ins. Co., 758 F.2d 337, 340 (8th Cir. 1985) ("Obviously, consideration of

which standard is appropriate is insignificant where both the state and federal standards are in fact substantially similar."). In considering a motion for JMOL, the district court views the evidence "in the light most favorable to the jury verdict." Moorhead Econ. Dev. Auth. v. Anda, 789 N.W.2d 860, 887 (Minn. 2010) (quotation omitted); see also Townsend v. Bayer Corp., 774 F.3d 446, 456 (8th Cir. 2014) (the district court must view the evidence "in the light most favorable to the prevailing party and the court can not weigh or evaluate the evidence or consider questions of credibility." (quotation omitted)). The district court should not grant JMOL "unless the evidence is practically conclusive against the verdict and reasonable minds can reach only one conclusion, (or) the jury's findings are contrary to the law applicable in the case." Anda 789 N.W.2d at 887–88 (quotation omitted); see also Howard, 615 F.3d at 995 ("Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." (quotation omitted)).

We conclude the district court properly denied Graham's motion for JMOL. The non-inducement clause of the Agent Agreement prohibited Graham from "directly or indirectly induc[ing], [or] attempt[ing] to induce . . . any policyholder of [American Family]" to cancel an American Family policy. The jury was presented with the February 2011 letter Graham sent to former customers and could reasonably have found that it amounted to a breach of the Agent Agreement. Though the letter specifically informed customers about Graham's "non-compete" agreement and his intent to "honor that agreement," it also informed customers that the agreement did not restrict him from offering a "broader range of insurance products" through "other companies that may be better suited for your needs." Graham acknowledged the letter was sent to "as many [former customers] as we could find."

Other testimony from Graham likewise supports the verdict. When asked why he did not send a letter simply telling customers he had moved firms and had a non-inducement agreement, Graham testified there "would be no reason" to send such

a letter. Graham also testified that he and his employees sent "dozens" of emails to former customers who had responded to the February 2011 letter, encouraging them to return their non-inducement forms so he could send them favorable insurance quotes. The jury heard the contents of some of these emails, which included language such as "[w]hen you get some time, just complete and return [the waiver form] and I can run some quotes which I really think will make you smile" and "[j]ust wondering if you got the form you requested. I would love to work some quotes up for you if it works to send [the waiver] back."

Graham admitted that more than 100 customers bought insurance from him after receiving the letter and cancelled their policies with American Family. The jury was presented with evidence that Graham sold at least 591 policies that replaced cancelled American Family policies and that the rate of Graham's customers cancelling their American Family policies was more than double that of other agents leaving American Family. A reasonable jury could conclude, based on all of the evidence presented, that Graham breached his Agent Agreement by inducing former clients to cancel their American Family policies within the prohibited time period.

## B. Motion for New Trial Based on Caves's Testimony

Graham argues the district court abused its discretion by allowing Austin Caves to testify that Graham had breached the Agent Agreement. Graham contends this testimony was an inadmissible legal conclusion. Graham asserts Caves's testimony was so prejudicial that he is entitled to a new trial on American Family's breach-of-contract claim.

At trial, Caves testified that, as an American Family sales manager, he was responsible for determining whether former agents complied with their Agent Agreements. Over Graham's objection, Caves testified that American Family considered Graham's February 2011 letter to be a violation of the non-inducement

clause. Graham moved for a new trial, alleging the court abused its discretion by allowing Caves to testify about the legal issue of whether Graham breached the Agent Agreement. Graham asserts this testimony was improper because it did nothing more than tell the jury what verdict it should return. See Kostelecky v. NL Acme Tool/ NL Ind., Inc., 837 F.2d 828, 830 (8th Cir. 1988) ("[E]vidence that merely tells the jury what result to reach is not sufficiently helpful to the trier of fact to be admissible.").

"We review the denial of a motion for a new trial for a 'clear' abuse of discretion, with the key issue being whether a new trial is necessary to prevent a miscarriage of justice." Hoffmeyer v. Porter, 758 F.3d 1065, 1068 (8th Cir. 2014) (quotation omitted). Because Graham's motion for a new trial is based on an allegedly erroneous evidentiary ruling, he must show the error affected his substantial rights and that a new trial would likely produce a different result. Pointer v. DART, 417 F.3d 819, 822 (8th Cir. 2005) (quotation omitted); see also Fed. R. Evid. 103. "The trial court is in the best position to determine whether the alleged error affected the substantial rights of any party sufficient to warrant a new trial, and the trial court's decision is entitled to considerable deference." Pointer, 417 F.3d at 822.

Here, we need not decide whether the district court erred in admitting Caves's testimony because Graham has not shown that any error affected his rights or that a new trial would produce a different result. Id. Caves testified during two days of the trial; and Graham objects only to Caves's answers to two questions during those two days. Just before the objected-to testimony, Caves had already testified, without objection, that American Family considered the letter a breach of the non-inducement clause because it offered a "broader range of insurance products," "more choices," and "expanded coverage and excellent rates." In addition, the February 2011 letter itself was strong evidence of the breach-of-contract claim, as was Graham's own testimony about the letter and his reasons for sending it. The jury also heard testimony about the number of American Family policyholders who switched companies after receiving the letter. If Caves's testimony had any effect on the jury,

it would have been slight given the nature and scope of the evidence presented at trial. As American Family points out, a reasonable jury would hardly have been surprised to hear, in a breach-of-contract case, that a representative of American Family was of the view that Graham violated a term of the Agent Agreement. We conclude the district court did not clearly abuse its discretion in denying Graham's motion for a new trial because Caves's testimony, even if erroneously admitted, was not "so prejudicial that a new trial would likely produce a different result." Harrison v. Purdy Bros. Trucking Co., Inc., 312 F.3d 346, 351 (8th Cir. 2002) (quotation omitted); see Pointer, 417 F.3d at 822.

## C. Motion for New Trial on Graham's Counterclaim

Graham asserts the district court erred in denying his motion for a new trial on his wrongful-termination counterclaim. Graham claims he was entitled to a new trial because the district court refused to give his proposed jury instruction defining the word "dishonest."

Our review of the denial of a proposed jury instruction is for abuse of discretion. Safety Nat. Cas. Corp. v. Austin Resolutions, Inc., 639 F.3d 498, 501 (8th Cir. 2011). "[F]ailure to give a proposed instruction must result in prejudice to the requesting party before a new trial will be ordered." Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497 (8th Cir. 1998). The court abuses its discretion only when the omitted instruction: "(1) correctly state[s] the applicable law; (2) address[es] matters not adequately covered by the charge; and (3) involve[s] a point 'so important that failure to give the instruction seriously impaired the party's ability to present an effective case.'" Id. at 496 (quoting Thomlison v. City of Omaha, 63 F.3d 786, 791 (8th Cir. 1995)). "Our review is limited to determining whether the instructions, when taken as a whole and in light of the particular issues presented, fairly and adequately presented the evidence and the applicable law to a jury." Am. Family

Mut. Ins. Co. v. Hollander, 705 F.3d 339, 355 (8th Cir. 2013) (quotation omitted) (interpreting Wisconsin law).

A key issue in dispute on Graham's counterclaim was whether American Family was entitled to terminate Graham's Agent Agreement without notice because he had engaged in "dishonest" conduct. The parties disputed what "dishonest" meant in the context of the Agent Agreement, and both parties proposed a jury instruction that offered a definition of "dishonest." In the alternative, Graham requested a *contra proferentum* instruction,[4] which would instruct the jury how to determine what the parties intended by using the word "dishonest." The district court found that the term "dishonest" was ambiguous and thus should be submitted to the jury, and it instructed the jury on *contra proferentum*. See Hollander, 705 F.3d at 355. The court further concluded that Wisconsin law does not allow the court to instruct both on *contra proferentum* and to give an instruction defining the disputed term. The court thus declined to give either of the proposed instructions defining "dishonest." See id. (citing D'Angelo v. Cornell Paperboard Prods. Co., 207 N.W.2d 846, 848 (Wis. 1973)).

Graham does not argue the district court erred in giving the *contra proferentum* instruction. Instead, he argues the district court erred in failing to give his preferred instruction defining "dishonest." We agree with the district court that it would be error under Wisconsin law to give a *contra proferentum* instruction—which requires a finding that a word is ambiguous—and to then define the same word in another

---

[4]"Contra proferentum is Latin for 'against the offeror.'" Hirschhorn v. Auto-Owners Ins. Co., 809 N.W.2d 529, 535 n. 5 (Wis. 2012) (quoting Black's Law Dictionary 328 (7th ed.1999)). The instruction given was a model Wisconsin jury instruction. Both parties agree Wisconsin law applies.

instruction. The district court properly instructed the jury regarding the term "dishonesty."[5]

## D. Damages Clause

Graham argues the district court erred in its application of Wisconsin law in finding that Section 6.u of the Agent Agreement was a valid stipulated-damages clause rather than an unenforceable penalty.[6] He asserts the Agent Agreement's use of the word "forfeiture" unambiguously shows the parties intended it to be a penalty. He further contends American Family did not prove that its damages from the breach of the Agent Agreement were difficult to ascertain. Finally, he claims the assessed stipulated damages are disproportionate to American Family's actual damages.

The parties tried to the court the issue of whether the stipulated-damages clause of the Agent Agreement was an enforceable stipulated-damages clause. American Family presented a forensic accountant and expert on valuation and damages, Joseph Kenyon. Kenyon testified about the difficulty of estimating damages at the time of contracting and his calculation of American Family's actual damages caused by Graham's breach. Graham did not present an expert. The trial court found the clause to be an enforceable stipulated-damages clause.

---

[5]Graham argues the district court could give both an instruction defining "dishonest" and a *contra proferentum* instruction because there were other terms in the agreement that were ambiguous. Graham asserts that the *contra proferentum* instruction would apply to these other terms, thus complying with Wisconsin law. Graham did not raise this argument to the district court, however, and we do not consider arguments raised for the first time on appeal. See Wiser v. Wayne Farms, 411 F.3d 923, 926 (8th Cir. 2005).

[6]The parties agree Wisconsin law applies to this issue.

Both parties rely on the test set forth in <u>Wassenaar v. Panos</u>, 331 N.W.2d 357, 362–63 (Wis. 1983), to support their arguments about whether the stipulated-damages clause in the Agent Agreement should be enforced. Under <u>Wassenaar</u>, whether a stipulated-damages clause should be enforced is a question of law for the district court. <u>Id.</u> at 360. We review the district court's resolution of disputed facts and inferences under a clearly erroneous standard. <u>Id.</u> at 361. Whether those facts demonstrate that the clause is reasonable is a question of law. <u>Id.</u> Though our review of that determination is de novo, we give some deference to the district court because the determination of reasonableness is so closely intertwined with the facts supporting the ruling. <u>Id.</u> The party contesting a stipulated-damages clause bears the burden of showing it should not be enforced. <u>Id.</u> at 361, 367.

"The overall single test of validity is whether the clause is reasonable under the totality of the circumstances." <u>Wassenaar</u>, 331 N.W.2d at 361–62. To determine whether the clause should be enforced, Wisconsin courts consider whether the parties intended to provide for damages or a penalty; the difficulty of accurately estimating or proving damages; and whether the stipulated damages are a reasonable forecast of the harm actually caused by the breach. <u>Id.</u> at 362–63. Of these factors, the parties' subjective intent is generally considered the least important in determining if a stipulated-damages clause is objectively reasonable. <u>Id.</u> at 363. The second factor, the "difficulty of ascertainment" test, helps assess the reasonableness of the clause; the harder it is to estimate or prove damages, the more likely a stipulated-damages clause will be considered reasonable. <u>Id.</u> The third factor concerns whether the stipulated-damages clause reasonably forecast actual damages; stipulated damages that are proportional to actual damages are more likely to be found reasonable. <u>Id.</u> at 364. In determining whether a stipulated-damages clause is reasonable, courts must look at both "the harm anticipated at the time of contract formation and the actual harm at the time of breach (or trial)." <u>Id.</u> at 364.

On appeal, Graham argues that the use of the word "forfeit" in the Agent Agreement shows the parties intended the clause to be a penalty rather than a valid stipulated-damages clause. While Graham's argument has some merit, "[t]he label the parties apply to the [stipulated-damages] clause . . . is not conclusive." Wassenaar, 331 N.W.2d at 363.[7] Therefore, the word "forfeit" is not determinative, and we must also look at whether the injury caused by the breach was difficult to estimate at the time of the contract and whether the stipulated damages reasonably forecasted the harm caused by the breach.

To determine if the injury caused by Graham's breach is difficult to ascertain, we consider

> [T]he difficulty of producing proof of damages at trial; the difficulty of determining what damages the breach caused; the difficulty of ascertaining what damages the parties contemplated when they contracted; the absence of a standardized measure of damages for the breach; and the difficulty of forecasting, when the contract is made, all the possible damages which may be caused or occasioned by the various possible breaches.

Wassenaar, 331 N.W.2d at 363–64. Joseph Kenyon testified that, at the time the Agent Agreement was signed, it would have been "nearly impossible" to estimate the damages American Family might suffer as a result of a breach of the non-inducement clause. Kenyon testified that there are many factors that can affect the damages caused by the breach, such as the number of customers an agent has, the mix of policy types, the changes in premium levels, and "whether those policies came from the personality of Mr. Graham versus the American Family name." These variables, he said, can vary widely over a period of years.

---

[7]Graham argues that the district court erred in considering Caves's testimony on the issue of intent. Whether this was error does not affect our analysis because we do not rely on Caves's testimony.

Graham does not assert that the parties could have ascertained at the time of contract what damages a future breach might cause. Instead, he argues that American Family's damages were easy to prove at the time of the breach. As support, Graham points out that American Family confirmed it lost 591 policies and believed it lost an additional 406 policies due to his inducement. He asserts it is a simple task to calculate the profit American Family would have made from these 997 policies. That may be true. But Graham offered the court no way to calculate American Family's lost profit from those 997 policies. And Graham overlooks the fact that American Family did present evidence of the estimated actual damages sustained as a result of Graham's breach.

Kenyon testified he had determined American Family's damages to be somewhere within a range of $800,000 and $1,350,000. He estimated American Family lost premium profits of $135,000 in the year 2011 for the 591 policies it confirmed actually went to Graham during 2011, the non-inducement year. He then calculated American Family's lost premium profits for those 591 policies out to Graham's likely retirement age, taking into account the normal policy attrition rate—that is, the number of policies usually cancelled every year. After discounting that number back to present dollars, he determined American Family's damages for those 591 policies to be $800,000.

Kenyon next compared the 2011 attrition rate of Graham's former policyholders with American Family's normal attrition rate. Kenyon estimated another 406 policies American Family lost in 2011 probably transferred to Graham because Graham's former policyholders had "higher than normal" attrition rates. He calculated American Family's lost premium profits for 2011 from those 406 policies was $93,000. Kenyon estimated this caused an additional $550,000 in lost profits,[8]

---

[8]Kenyon testified he used the same methodology to estimate this higher benchmark. He first estimated what American Family's lost premium profits were for

giving him the higher benchmark of $1,350,000. Graham's extended earnings, $938,000, was within Kenyon's range.

Graham argues the factual record does not support Kenyon's estimated range. He asserts there is no proof the 591 policies transferred during 2011 went to his agency because of improper inducement rather than for some other reason. Graham further contends it was pure speculation to assume an additional 406 policies went to his agency based solely on the "higher than normal" policy attrition rates during 2011. He claims Kenyon's higher estimate is flawed because it compared his attrition rate with attrition rates expected when an agent retires, rather than when an agent is terminated and starts a new agency. He also contends American Family is only entitled to damages for 2011 because after 2011 he could have pursued his former customers anyway. Graham asserts that once Kenyon's "overly speculative and unsupported post-inducement projections are set aside"—that is, Kenyon's projected losses for 2012 and beyond—American Family's damages were no more than $228,000. Graham asserts this is grossly disproportionate to the stipulated damages of $938,000.

Graham's points are well-taken. But he offered no evidence to support them. For example, he argues that Kenyon's reliance on the "higher than normal" policy attrition rates to estimate that an additional 406 policies went to Graham's agency during 2011 was improper; but he failed to present evidence to show how, why, or to what extent that estimate is inaccurate. Similarly, whether post-2011 damages should have been included (because Graham was allowed to pursue his former customers after 2011) is a fact-intensive issue. Yet the only evidence the district court heard on this issue was from Kenyon, who said that post-2011 damages had to

2011 and then projected that number out to Graham's likely retirement age, reducing the profits each year for the typical policy attrition rate. He then discounted that amount back to present dollars.

-14-

be included because it was unlikely that all of the customers who switched policies from American Family to Graham's new agency in 2011 would have done so in 2012 or later absent Graham's inducement during 2011. According to Kenyon, "most people historically keep their insurance with the same company." In addition, Kenyon testified, customer loyalty plays an important role in the insurance industry; had another American Family agent been given an opportunity to develop a relationship with those customers in 2011, it is likely a certain percentage of them would have stayed with American Family. And Graham offered no evidence at all to support his assertion that retirement is materially different than termination for purposes of analyzing attrition rates. As the party trying to set aside the stipulated-damages clause, it was Graham's burden, not American Family's, to "prov[e] facts which would justify the trial court's concluding that the clause should not be enforced." Wassenaar, 331 N.W.2d at 361.

Finally, Graham argues the district court erred as a matter of law in finding that the stipulated-damages clause was a reasonable forecast of American Family's damages because the amount of damages in the clause is not connected to any actual harm that results from a breach. He asserts that, regardless of the circumstances triggering application of the stipulated-damages clause, the penalty remains the same: forfeiture of the entire amount of extended earnings as of the date of the breach. As a result, Graham argues, the clause does not, and cannot, provide a reasonable forecast of compensatory damages. Whether American Family suffered no damages, few damages, or substantial damages from a breach of an Agent Agreement, the stipulated damages are the same.

Viewed in this way, the stipulated-damages clause in American Family's Agent Agreement gives us significant pause. The loss of an agent's entire extended earnings, regardless of the nature or timing of the breach, seems a penalty. Under a different set of circumstances, with different evidence presented to the district court, such a clause might very well be unenforceable. We also suspect that a "standardized

measure of damages" could be formulated for calculating stipulated damages in cases like this one. It is difficult to imagine that the amount of money that happens to be in an agent's extended earnings account at the time of a breach is a reasonable amount of stipulated damages in every case. A set formula that takes into consideration factors that affect the amount of damages based on the nature and circumstances of the breach would likely more accurately link the amount of stipulated damages to actual damages.

But here, the district court heard evidence that it was difficult to estimate damages at the time of the contract and that the amount of stipulated damages was proportional to the actual damages resulting from Graham's breach. Based on that evidence, the district court found the stipulated-damages clause of the Agent Agreement was a reasonable stipulated-damages clause. See Wassenaar, 331 N.W.2d at 361 (the determination of whether a damages clause is enforceable involves determinations of fact and law). On the record before us, we cannot say the district court erred in its finding.

### III. Conclusion

We affirm the judgment of the district court.

_____