# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1968
_____

Bamford, Inc., a Nebraska business corporation

*Plaintiff - Appellee*

v.

Regent Insurance Company, both Wisconsin business corporations

*Defendant - Appellant*

General Casualty Insurance Company of Wisconsin, both Wisconsin business corporations

*Defendant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: February 10, 2016
Filed: May 13, 2016

_____

Before SHEPHERD, BEAM, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

In May 2009, an employee of Bamford, Inc. ("Bamford") caused a vehicular accident resulting in third-party injuries. Bamford requested that its insurer, Regent

Insurance Company ("Regent"), settle the claims within Bamford's policy limits. Regent did not settle the claims, the case proceeded to trial, and a jury returned a verdict in excess of Bamford's policy limits. Bamford brought this action against Regent, alleging that Regent acted in bad faith in not settling the claims. The jury returned a verdict for Bamford. Regent appeals the district court's[1] denial of its post-verdict motion for judgment as a matter of law or for a new trial. We affirm.

I.

In 2008, Bamford purchased commercial automobile liability insurance from Regent with a total policy limit of $6 million.[2] In May 2009, Michael Packer ("Packer"), a Bamford employee, was involved in a two-vehicle collision with a vehicle driven by Bobby Davis ("Bobby"). During the accident, a steel pipe stored on the roof of Packer's vehicle became dislodged and ultimately penetrated Bobby's left thigh, through his abdomen and pelvis, and out his right buttock, pinning him inside his vehicle. Bobby was trapped for between thirty and sixty minutes until paramedics arrived and were able to cut the pipe and extract him. He suffered a number of serious injuries and underwent extensive medical treatment to save his life and treat his injuries. Bobby's brother, Geoffrey Davis ("Geoffrey"), was a passenger in Bobby's vehicle and suffered minor injuries. His claims against Bamford were settled and are not relevant to this appeal. Packer burned to death inside his vehicle.

Regent opened a claim file the day after the accident. An adjuster prepared an internal document known as a large loss notice ("LLN"), which established a

_____

[1]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

[2]Regent has several parent corporations. For ease of reference, some employees and policies of its parent corporations are referred to as employees and policies of Regent.

$1,000,000 reserve from Bamford's policy to cover claims arising from the accident. Of the reserve, $700,000 was designated for Bobby's injuries. Bobby, Geoffrey, and Bobby's wife, Brenda Davis ("Brenda"), retained attorney Tom Fee ("Fee") to represent them. In May 2010, based on Fee's communications regarding the nature and extent of Bobby's injuries, Regent moved the Davises' claims to its major case unit. In July 2010, Regent hired Nebraska attorney Brian Nolan ("Nolan") to provide a valuation of the Davises' claims.

On August 5, 2010, Fee sent Regent a settlement packet offering to settle the Davises' claims for Bamford's policy limit of $6 million. Fee asserted that the claims had a verdict potential between $7.5 and $10 million and stated that if the offer was not accepted by September 13, the settlement amount would increase to $10.6 million. The settlement packet included videotaped interviews of an accident witness and Bobby's emergency room physician, in addition to over 1,000 pages of attachments, such as the police report of the accident, photographs, medical records, an economist's report, tax returns, and a life care plan. Later that month, Regent hired Nolan to defend Bamford against the Davises' claims, and Bamford independently hired Nebraska attorney Daniel Placzek ("Placzek") to represent its interests in the matter. On August 23, Placzek sent Regent a letter asserting that the Davises' claims presented an exposure risk above Bamford's $6 million policy limit and demanding that Regent settle the claims within the policy limits.

In early September 2010, Nolan informed Regent that he did not think the value of the Davises' claims was close to the policy limits. On September 29, 2010, he valued their claims at less than $1 million. That same month he informed Regent that he was investigating a possible loss-of-consciousness defense, predicated on the theory that Packer, suddenly and unforeseeably, lost consciousness before causing the accident. Nolan explained that such a defense would be a complete bar to liability, but that he needed more information–such as Packer's medical records–to properly evaluate its applicability.

In December 2010, Nolan informed Regent that he had learned that Packer had a history of seizures, but had controlled them with medication. While noting that he still needed more information, Nolan conveyed his belief that the loss-of-consciousness defense had a 25% chance of success. Further, Nolan increased his valuation of the Davises' claims to a settlement value between $1.5 and $1.75 million, based on additional information he had received about Bobby's medical procedures and expenses.

Bamford and the Davises participated in a mediation in December 2010. Regent authorized Nolan to commit as much as $1 million to settlement of the claims. Nolan began negotiations at $500,000, and Fee began at $6 million. Nolan ultimately came up to $775,000, and Fee ultimately came down to $4,995,000. Regent instructed Nolan to offer $1 million and indicated that he would be given authority to offer more if he thought the case would settle. The mediator valued the case at between $2.5 and $3 million and instructed Nolan not to offer $1 million because such an offer would not make significant headway in advancing the mediation.

In February 2011, the Davises filed suit against Bamford and Packer's estate in the United States District Court for the District of Nebraska, alleging several theories of Bamford's liability for their injuries. Brenda's claims were primarily for loss of consortium resulting from Bobby's alleged post-accident impotence. The same month, Regent internally assigned the Davises' claims to an adjuster named Wesley Robin ("Robin").

On March 14 and March 17, 2011, Nolan sent letters to Robin noting that Fee had asserted that the case was worth more than the policy limits; advising Robin that Nolan had unsuccessfully researched a second possible liability defense based on a theory that Packer had fraudulently concealed his seizure disorder from Bamford ("fraudulent-concealment defense"); and stating that, were the fraudulent-concealment defense applicable, "recovery by plaintiff's counsel for above and beyond the policy

limits would have been much less likely to occur." (Tr. Ex. 32 (March 14 letter); Tr. Ex. 206 (March 17, letter) (excess recovery would have been "much less likely to be at issue.")).  In the March 17 letter, Nolan stated his continued belief that the facts of the case warranted asserting the loss-of-consciousness defense, but noted that Regent would need to continue reassessing the defense's applicability throughout discovery.

In September 2011, Regent sought a second valuation opinion of the Davises' claims, this time from Nebraska attorney Steve Ahl ("Ahl").  Ahl valued the claims between $1.75 and $2.25 million, first verbally in September, and then in a letter in November.  Ahl opined that the value of the claims would not approach Bamford's policy limits.

In October 2011, the Davises reinstated their policy limits settlement demand, citing improvements in their case based on depositions of eye-witnesses to the accident. Placzek again demanded, on Bamford's behalf, that Regent settle within the policy limits because of Bamford's exposure risk.  Robin worked on preparing an LLN to increase the posted reserve for Bobby's claims from $700,000.  During Robin's work on the LLN, he corresponded via email with a Regent supervisor who warned him that a large increase in the reserve would be a "big red flag" to senior management, but conveyed his understanding of Robin's sentiment that "[t]rying to cover up for someone else's mistakes from one year ago is never easy."  (Tr. Ex. 53 at 1-2.)  The LLN increased the reserve for Bobby's claims to $1.75 million.

In early November 2011, Nolan increased his valuation to $2 million.  Around that time, Robin noted in an email to Regent executives that determining a settlement range was more challenging than in most cases, given the unique nature of Bobby's injuries.  Several executives commented on the value of the Davises' claims in subsequent emails.  One executive opined that, based on his perception of Nebraska as a conservative state, "nothing is worth more than $2M in N[ebraska]." (Tr. Ex. 55 at 6.)  The same executive tempered this sentiment by noting that the loss-of-

consciousness defense was problematic in any venue, and that the nature of the injuries would likely illicit sympathy from a jury. He suggested a settlement range between $1.75 and $2 million, based on Nolan and Ahl's recommendations. Another executive suggested that $1.75 million sounded optimistic, and warned that the case "could get worse unless we are all very comfortable with the numbers." (Id. at 5.) He stressed that they needed to "make sure we look at this with a fresh view and don't get locked into something based on a fact pattern or bias." (Id.) In late November Robin prepared a third LLN (his second LLN), which increased the reserve for Bobby's claims to just under $2 million. At that time, Robin conveyed to his supervisors that he estimated a 75% chance the case would settle for $2 million.

In addition to the Regent executive's reaction that "nothing is worth more than $2M in N[ebraska]," the record contains several other instances of individuals–including Robin, Nolan, and Ahl–articulating their perception that Nebraska was a conservative jurisdiction in terms of jury verdicts. In one instance, in the context of a written settlement offer, Fee inserted a parenthetical after his valuation of potential jury verdict, indicating "yes I know I am in Nebraska." (Tr. Ex. 60 at 1.) Fee followed that line by asserting: "Bottom line is . . . this is a real bad case with a bad injury in any venue." (Id.)

The Davises filed a motion for partial summary judgment on March 22, 2012, requesting that the district court strike Bamford's loss-of-consciousness defense. The parties participated in a second mediation the same day. Nolan's highest offer at the second mediation was $1.6 million, and Fee's lowest settlement offer was $5.4 million. During the mediation, the mediator informed Nolan and Robin that the Davises would not settle for less than somewhere in the $3 million range, and made a comment Robin interpreted as indicating that, were the mediator representing Bamford, he would not settle for more than $2.5 million. The day after the mediation, the Davises offered to settle for $5.45 million. In early April, Placzek, for the third

time, demanded that Regent settle the Davises' claims within the policy limits, again asserting that the Davises' claims presented exposure above Bamford's policy limits.

With the trial scheduled for June 25, 2012, Nolan prepared a pretrial report on May 4. In his comprehensive report, Nolan increased his anticipated verdict range to between $2 and $3 million. He also decreased his estimate of the success of the loss-of-consciousness defense from 25% (as expressed in December 2010) to 10%. He explained the benefits of presenting such a defense to the jury, and noted that the Davises had challenged it in their motion for partial summary judgment:

> [A] likely jury might also be troubled by the potential merits of the loss of consciousness defense even while rejecting its application. Sometimes a jury, while rejecting a defense, can be influenced, informally, by such a defense in considering other issues in the case. That is, just as we feel Mr. Packer's death in this accident might have some impact on the jury, the jury might both reject the sudden loss of consciousness defense but also moderate the assessment of damages otherwise to be awarded.

> We note that issues relating to the sudden unconsciousness defense are before the court on the pending motion of the Plaintiff for partial summary judgment as to this defense. Certainly, whatever ruling is to be made will be made in advance of trial, allowing for a more complete assessment of the availability of this defense.

(Tr. Ex. 39 at 24.)

Robin, Nolan, and several Regent executives and adjusters participated in a telephonic round-table discussion on May 15. Nolan informed the group that Fee had advised him that he would recommend to his clients a settlement between $3.8 to $3.9 million. The round-table group decided to increase the reserve for the Davises' claims by $250,000 to $2.25 million. On May 31, Robin prepared the fourth and final LLN for the case (his third LLN). In accordance with the round-table decision, it increased the reserve to $2.25 million for Bobby's injuries.

The three LLNs prepared by Robin specified reserves for Bobby of $1.75 million, $2 million, and $2.25 million on October 30, 2011, November 20, 2011, and May 31, 2012, respectively. The LLNs ostensibly broke the total reserves down into categories of damages, and anticipated values thereof. Specifically, the LLNs listed past medical damages, future medical expenses, pain and suffering, disfigurement, permanent impairment, past lost wages, and future lost wages. The only difference between the first two LLNs prepared by Robin was that his second LLN doubled the value of disfigurement from $250,000 to $500,000. There were three changes between Robin's second and final LLNs. First, his final LLN increased past medical expenses from $222,083 to $245,000. Second, his final LLN increased future medical expenses from $150,000 to $630,845. Third, his final LLN removed any mention of future lost wages, thus reducing the $353,625 value reflected in his second LLN to a value of $0.

Robin testified that he merely listed the categories of damages in the LLNs to fulfill Regent's parameters, and that values he listed were, effectively, meaningless. He explained that he had started with a total value and then "massaged [his] numbers" so that the categories of damages added up to his total value of the claim. This was his typical method while working for Regent. He testified that other insurance employers had not required him to break the total value down into categories of damages. He further testified that, although the LLNs identified Bobby's damages only, and did not appear to include any damages for Brenda's loss-of-consortium claim, he had factored Brenda's claim into the total amount reserved for Bobby's injuries.

On June 7, 2012, Placzek sent Nolan a fourth letter demanding that Regent settle the Davises' claims within the policy limits. Placzek's fourth letter was seven pages long, detailed the evidence developed in discovery which Placzek believed would support an excess verdict, and specified how he believed the evidence would combat Nolan's planned arguments. Placzek advised Nolan that an excess verdict

would "cripple Bamford, Inc. and may place its very existence at risk." (Tr. Ex. 22 at 7.)

The district court granted the Davises' motion for partial summary judgment on June 19, 2012. Not only did the court grant the Davises' request to strike the loss-of-consciousness defense, it went further and found Bamford liable as a matter of law. As a result of the ruling, the only issue at trial would be the amount of damages to which the Davises were entitled. Robin explained the significance of the district court's ruling in an email to a superior, and in his adjuster's log:

> Part of my evaluation was based on the fact that the objective evidence supports the conclusion that Michael Packer suffered a medical emergency, which caused the accident. . . . Given the judge's ruling that there is negligence as a matter of law, the jury won't know about the facts supporting the possibility of a medical emergency, and there won't be a tempering of damages.

(Tr. Ex. 58 at 5 (Email to superior).)

> I expected the facts to temper the damages. I never thought that we'd prevail on liability, but given that our driver perished and the objective facts appear to support a medical emergency, the jury wouldn't be angry w/ our insured and instead might be sympathetic, thus lowering the award. W/out the sympathetic facts of the accident, I am concerned that the award will be higher since we're only talking damages.

(Tr. Ex. 16 at 9389 (Log Entry).)

As a result of this development in the case, Nolan and Robin requested authorization to make a $3 million settlement offer. Neither Nolan nor Robin believed that the Davises would accept $3 million, but Nolan believed that the district judge would pressure the Davises to accept the offer, and that the offer would curry favor

with the judge leading to trial. Robin testified that he believed such an offer likely would have led to a settlement in the $3 million range. Robin and Nolan did not receive authority for a $3 million settlement offer. Their authority was never increased from the previously-set $2.25 million.

The week before trial, the parties' settlement negotiations intensified. In a June 20 letter, Fee offered to settle for $5.3 million; Nolan made a counter offer of $1.75 million. In a June 21 email to Nolan, Fee opined that the economic damages alone were at least $2.6 million, with eight unknown categories of non-pecuniary damages; that he was confident the verdict would be at least in the $3.5 to $4.5 million range; and that Nolan was putting his clients at risk of an excess verdict, particularly in light of the district court's liability ruling. On June 22, Fee offered to settle for $5.2 million or, in the alternative, a bracket in which the Davises would move to $4.2 million and Bamford would move to $3.2 million, with the Davises having the next move. Fee emphasized that the Davises would not settle in the $2 million range. In a June 22 email, Nolan offered $1.85 million. On June 24, the day before trial, Fee sent Nolan an email offering to settle for $3.9 million. Nolan countered with an offer of $2.05 million. Fee responded by email, stating:

> Just making sure everyone knows this case can be settled in the 3 mil range. That is very reasonable. Your client[']s insurance carrier has had years to evaluate this case and have had 2 mediations and plenty of time to settle the case. Again case will never settle in the 2 millions. I and my clients would rather take our shot with a jury. You guys are unnecessarily putting your clients at risk if you allow me to try this case to a jury in my opinion but that is not my decision to make. I look forward to seeing you tomorrow for trial.

(Tr. Ex. 62 at 1.)

Trial commenced on June 25, 2012, and Fee refused to continue settlement discussions. Regent did not make another offer, believing that its last offer of $2.05

million was still pending because Fee had not explicitly rejected it. The trial lasted seven days, and resulted in the jury returning a verdict of approximately $10.6 million for the Davises. Bamford appealed. During the pendency of the appeal, the parties settled the case for approximately $8 million. Bamford was responsible for the amount in excess of the policy limits.

In July 2014, Bamford filed this action against Regent, alleging, as relevant, that Regent breached its fiduciary duty and acted in bad faith in refusing to settle the Davises' claims. Bamford requested damages in the amount it had contributed to the settlement, as well the fees it had paid Placzek. At trial, Bamford called Placzek as an expert witness, and he testified that Regent's failure to settle the claims constituted bad faith. An insurance industry professional also appeared as an expert witness for Bamford, testifying that Regent failed to conduct a fair and reasonable valuation of the Davises' claims, and criticizing Robin's methodology in reverse-engineering the total values. Following a five-day trial, the jury returned a verdict for Bamford, awarding its requested damages of $2,037,754.33. Pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure, Regent filed a renewed motion for judgment as a matter of law or for a new trial, challenging the sufficiency of the evidence and the jury instructions. The district court denied the motion.

## II.

"We review de novo the district court's denial of a motion for judgment as a matter of law, using the same standards as the district court." Am. Family Mut. Ins. Co. v. Graham, 792 F.3d 951, 955 (8th Cir. 2015) (quotation omitted). Under Rule 50, a court may grant a motion for judgment as a matter of law against a party if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). To make this determination, the court reviews all record evidence, and views it in the light most favorable to the

prevailing party. Townsend v. Bayer Corp., 774 F.3d 446, 456 (8th Cir. 2014). The court draws all reasonable inferences in favor of the prevailing party, without making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Great deference is given to the jury's verdict, and judgment as a matter of law should be granted "only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." Howard v. Mo. Bone & Joint Ctr., Inc., 615 F.3d 991, 995 (8th Cir. 2010) (quotation omitted).

"The standard for granting a motion for new trial is higher still." Id. On appeal, we review the district court's denial of a motion for a new trial "for a clear abuse of discretion, with the key question being whether a new trial is necessary to prevent a miscarriage of justice." Wagner v. Jones, 758 F.3d 1030, 1033-34 (8th Cir. 2014) (quotation omitted). Where, as here, the motion for a new trial is based on an assertion that the verdict is counter to the weight of the evidence, "the district court's denial of the motion is virtually unassailable on appeal." Keenan v. Computer Assocs. Int'l, Inc., 13 F.3d 1266, 1269 (8th Cir. 1994) (quotation omitted).

We review the district court's jury instructions for abuse of discretion, and reverse "only where the error affects the substantial rights of the parties." Bauer v. Curators of the Univ. of Mo., 680 F.3d 1043, 1044 (8th Cir. 2012). A new trial will be ordered only "if the error misled the jury or had a probable effect on its verdict." Acuity v. Johnson, 776 F.3d 588, 596 (8th Cir. 2015) (quotation omitted).

III.

Under Nebraska law, an insurer's bad faith failure to settle within policy limits can be demonstrated by:

-12-

[1] the insurance company's unwarranted rejection of an offer to settle within the policy limits, or [2] a complete and total failure to take into account the potential liability of its insured for an excess judgment, or [3] an insurer's failure to timely and adequately inform its insured of the insurer's adverse interest, of settlement, demands and offers, and of the potential value of the case.

Hadenfeldt v. State Farm Mut. Auto. Ins. Co., 239 N.W.2d 499, 504 (Neb. 1976). The Nebraska Supreme Court has explained its "controlling rule" on this issue:

If the insurer has exercised good faith in all of its dealings under its policy, if the settlement which it has rejected has been fully and fairly considered and has been based on an honest belief that the insurer could defeat the action or keep the judgment within the limits of the policy, and if its determination is based on a fair review of the evidence after reasonable diligence in ascertaining the facts, accompanied by competent legal advice, a court will not subject the insurer to liability in excess of policy limits if it ultimately turns out that its determination is a mistaken one.

Olson v. Union Fire Ins. Co., 118 N.W.2d 318, 322-23 (Neb. 1962).

Regent argues on appeal that no evidence was presented at trial from which a reasonable jury could find that it refused to settle the Davises' claims in bad faith, but rather, that the trial evidence demonstrated that the failure to settle was an honest mistake in judgment. Regent contends that this conclusion is "evidenced unequivocally" by the fact that it ultimately had to pay over $2 million more than the Davises' last demand of $3.9 million. Regent further argues that its alleged bad faith is not supported by the record because it made multiple efforts to settle; it continuously increased its reserves and offers; it followed the advice and valuations of Ahl, Nolan, and the two mediators; it discussed the claims in a round-table meeting of senior management; it reasonably relied on Nebraska's reputation as a conservative

-13-

jury verdict jurisdiction; Fee himself opined that the verdict would be at least in the $3.5 to $4.5 million range; and Regent believed that settlement negotiations would continue during the trial.

These arguments, if accepted, could perhaps be adequate to support the conclusion that Regent acted in good faith. However, the question at bar is whether, drawing all reasonable inferences in Bamford's favor, a reasonable jury could find that Regent acted in bad faith. See Reeves, 530 U.S. at 149-50. We hold that there was sufficient evidence in the record to support such a conclusion.

Both the Nebraska Supreme Court and this Court have addressed the scenario presented here: a jury finding that an excess judgment had been entered against an insured in an earlier trial as a result of the insurer's bad faith refusal to settle the case within the policy limits. See Olson, 118 N.W.2d at 320; Lienemann v. State Farm Mut. Auto Fire & Cas. Co., 540 F.2d 333, 335-36 (8th Cir. 1976). In Olson, the insurer's decision not to settle the underlying third-party claims against the insured was supported by the recommendations of the insurer's legal counsel, claims department manager, and attorney hired to evaluate liability, all of whom opined that the insured was not liable as a matter of law. 118 N.W.2d at 321. After the trial court held that the claims against the insured were sufficient for submission to the jury, the insurer's same "agents and legal counsel" held fast in their recommendation and "determined that the case could be successfully defended before an impartial jury." Id. The jury returned an excess verdict against the insured. Id. at 320. In the subsequent bad faith action, the jury returned a verdict against the insurer, finding that its refusal to settle had been in bad faith. Id. The Nebraska Supreme Court vacated the jury verdict, holding that the insurer was entitled to judgment as a matter of law because the evidence demonstrated that the insurer honestly believed–based on the consistent advice of counsel and its internal advisors–that the liability defense would defeat the claim against the insured, and thus, there was insufficient evidence for the

jury to conclude that the insurer acted in bad faith in deciding to try the case rather than settle. Id. at 320-23.

In Lienemann, this Court–sitting in diversity and applying Nebraska law–reached the opposite conclusion, holding that "the jury was entitled to find that [the insurer] acted in bad faith and prejudiced the rights of its insured." 540 F.2d at 339. Early in the underlying litigation, the insurer received competent medical and legal advice regarding a possible liability defense and, on the strength of such advice, refused to negotiate a settlement with the third-party claimant. Id. at 338. After the viability of the defense was called into question by the defense's own expert, the insurer stayed the course and rejected, over the insured's demand, a settlement proposal that would have required the insurer to pay the policy limits. Id. at 338-39. In the most instructive portion of the opinion, we stated:

> [I]t is a rare tort case in which either party can in good faith totally ignore the development of adverse facts before and during the trial, and the changing probabilities to be weighed in negotiating a settlement. In all kinds of litigation, witnesses go sour, evidence previously thought admissible becomes inadmissible or vice versa, and the probabilities change with the trial court's rulings from day to day. Mere failure to weigh these factors properly is not bad faith. However, refusal even to consider them is another matter, especially when insurance counsel represents the interests of both insurer and insured.

Id. at 339.

Here, the jury could have concluded that Regent–by relying on valuations received from mediators, counsel, and internal adjusters–reasonably embraced a low value for the Davises' claims early in the case, but ultimately acted in bad faith in failing to reassess the value of the claims in light of case developments and advice from its own players that the low value was inaccurate. Cf. Olson, 118 N.W.2d at 322

-15-

(noting that an insurer must exercise good faith "in all of its dealings under its policy," and should rely on "competent legal advice"). Regent's failure to adjust its valuation following the district court's grant of partial summary judgment strongly supports such a conclusion.

Again, the district court did not merely grant the Davises' request to strike the loss-of-consciousness defense. The court went much further and found Bamford liable as a matter of law. For nearly two years, Nolan and Robin had counted on a tempering of damages when the jury heard the purportedly sympathetic facts that would be introduced to support this defense, such as Packer's history of seizures and use of seizure medication. They had also believed that the loss-of-consciousness defense, which would have provided Bamford a complete bar to liability, had a slight chance of success.[3] In the wake of the district court's ruling, the jury would hear neither the purportedly sympathetic facts supporting a medical emergency nor other evidence that could moderate its view of Bamford's culpability. Rather, the jury would be instructed that Bamford was negligent as a matter of law and liable for the Davises' injuries. In response to this major development in the case, Nolan and Robin requested authority to make a $3 million settlement offer, both for strategic purposes and because, in Robin's view, the offer would have led to a settlement in the $3 million range. Not only did Regent deny such authority, it failed to increase its reserve even one penny from the previously-set amount of $2.25 million. A reasonable jury could view Regent's stark inaction–in the face of this seismic and unforseen development in the case, and contrary to advice from its counsel and primary adjuster–as a complete and total refusal to consider the fiduciary duty it owed Bamford. See Lienemann, 540 F.2d at 339 (an insurer cannot, in good faith, completely ignore adverse pretrial developments); cf. Olson, 118 N.W.2d at 321

---

[3]At different times in the case Nolan estimated the loss-of-consciousness defense to be between 10 and 25% likely to succeed.

(finding insufficient evidence of bad faith where insurer consistently followed the advice of its "agents and legal counsel").

In the same manner, a reasonable jury could have rejected Regent's assertions that it acted in good faith by following the advice and valuations of Ahl, Nolan, and the two mediators. With regard to Ahl's valuation, Ahl answered questions on direct examination regarding several depositions that occurred after he issued his valuation, and the record is replete with other evidence, such as medical reports, that was not disclosed until after his valuation. Similarly, one mediator formed his opinion before any discovery had been conducted, and the other mediator formed his opinion prior to the completion of discovery. Most importantly, all three of these valuations were provided well before the district court found Bamford liable as a matter of law. Regent continues to cite Nolan's early valuations as evidence that it acted in good faith, despite the fact that it ignored his later valuation of the Davises' claims and his request for authorization to make a $3 million settlement offer.

We further note that the two letters Nolan wrote Robin in March 2011 appear to be the only instances in the record of anyone on Regent's behalf acknowledging Bamford's potential exposure to an excess judgment. This acknowledgment was made in the context of Nolan advising Robin that the fraudulent-concealment defense was not viable, while noting that, were it viable, it would have made an excess judgment "much less likely to occur." Thus, despite the inapplicability of the fraudulent-concealment defense, Fee's repeated reminders that he planned to seek an excess judgment at trial, and Placzek's repeated demands to settle within policy limits to avoid an excess judgment, Regent does not appear to have considered Bamford's potential liability in the settlement negotiations. The jury could have reasonably inferred "a complete and total failure to take into account the potential liability of [Bamford] for an excess judgment," Hadenfeldt, 239 N.W.2d at 504, and concluded from this inference that Regent acted in bad faith.

-17-

Additionally, Robin testified that he "massaged [the] numbers" on Regent's internal documents by starting with a total value and working backwards, rather than assessing the individual categories of damages that would ultimately add up to the verdict. To this end, he permanently deleted a value for future loss of earning capacity from his valuation after previously accounting for it, and never included a value for Brenda's loss-of-consortium claim. He apparently massaged the numbers in this manner to ensure that they would add up to a predetermined–and seemingly arbitrary–total amount. Indeed, his methodology makes it difficult, if not impossible, for a finder of fact to assess how Regent's internal valuation was so far off. In casting doubt upon Robin's valuation process, one of Bamford's experts testified at trial that Regent failed to conduct a fair and reasonable valuation of the claim. Further, trial exhibits and Robin's testimony indicated that there were internal concerns for a possible "big red flag" to management by greatly increasing the reserves, and difficulties covering for other adjusters' mistakes. This evidence could have led the jury to infer that Regent was not focused on carrying out its fiduciary duty to protect Bamford's interests.

In sum, we hold that Bamford presented sufficient evidence from which a reasonable jury could conclude that Regent acted in bad faith in failing to settle the Davises' claims within the policy limits.[4] Based on the same record evidence, we hold that the district court did not abuse its discretion in denying Regent's motion for a new

---

[4]Regent relies heavily upon Christian Builders, Inc. v. Cincinnati Insurance Co., 501 F. Supp. 2d 1224 (D. Minn. 2007), where the court granted summary judgment in the insurer's favor in a Minnesota bad faith failure to settle case. However, Christian Builders is distinguishable in many ways. For example, the insurer "always gave [the attorney it hired to represent the insured] settlement authority that was within the range of the settlement values that he recommended." Id. at 1231. Further, the insurer did not fail to respond to any major case developments, and there were no indications of the kind of questionable internal procedures evidenced in the record here.

trial predicated on the sufficiency of the evidence. See Wagner, 758 F.3d at 1033-34. Finally, we hold, without further comment, that the district court did not abuse its discretion in giving the challenged jury instructions, which were nearly identical to instructions approved by the Nebraska Supreme Court, and must be read as a whole with all of the instructions. See Bauer, 680 F.3d at 1044; Lienemann, 540 F.2d at 340 n.4; Hadenfeldt, 239 N.W.2d at 504-05.

## IV.

Accordingly, we affirm the district court's denial of Regent's post-verdict motion for judgment as a matter of law or for a new trial.

_____