# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-4059

_____

James L. Dean; Lois P. White, as Personal Representative of the Estate of Joseph White, deceased; Kathleen A. Gonzalez; Thomas W. Winslow; Ada Joann Taylor; Debra Shelden

*Plaintiffs - Appellees*

v.

Burdette Searcey, Dep., in his official and individual capacities; Wayne R. Price, PhD., in his official and individual capacities; County of Gage, Nebraska, a Nebraska political subdivision

*Defendants - Appellants*

Ryan L. Timmerman, Personal Representative of the estate of Jerry O. DeWitt

*Defendant*

------------------------------

The Nebraska Association of County Officials; Nebraska Sheriffs Association; National Sheriff's Association; International Municipal Lawyers Association; The Nebraska Intergovernmental Risk Management Association

*Amici on Behalf of Appellant(s)*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: November 16, 2017
Filed: June 11, 2018

_____

Before BENTON, SHEPHERD, and KELLY, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This case is familiar to us, as it is to Nebraskans and much of the nation. It returns after three prior opinions by this Court, two trials, and, now, one jury verdict that is contested on this appeal. We are asked here, in large part, to sweep the pieces off the board—to overturn our prior rulings—in order to vacate the jury's verdict. We decline to do so. And, after careful examination of the remaining claims on appeal, we find no other reason to disturb the verdict or rulings by the district court.[1] Thus, we affirm.

I.

The underlying facts in this case have been discussed at length in past appeals. See Winslow v. Smith, 696 F.3d 716 (8th Cir. 2012); White v. Smith, 696 F.3d 740 (8th Cir. 2012); Dean v. Cty. of Gage, 807 F.3d 931 (8th Cir. 2015), cert. denied, 136 S. Ct. 2490 (2016). We provide a brief procedural summary to orient our discussion.

Appellees are six individuals—Joseph White, Ada JoAnn Taylor, Thomas Winslow, Debra Shelden, Kathleen Gonzalez, and James Dean—who were arrested for the gruesome February 1985 rape and murder of Helen Wilson in Beatrice,

_____

[1]The Honorable Richard G. Kopf, United States District Judge for the District of Nebraska.

Nebraska.[2]   All pled guilty to various charges in relation to the crime with the exception of Joseph White—he went to trial and was convicted for first-degree felony murder.  Shelden, Gonzalez, and Dean served around five years; the rest served nearly twenty years.[3]  Appellees were exonerated by DNA evidence in 2008, and the State of Nebraska formally pardoned them in 2009.  That same year, they filed this lawsuit on the grounds that their deprivations of liberty were preventable: they argued that their arrests and imprisonment were the result of a reckless investigation, manufactured false evidence, and coerced confessions.  They assert claims under 42 U.S.C. § 1983, as well as parallel conspiracy claims under 42 U.S.C. § 1985, against Gage County (where Beatrice is located) and three individuals in the Gage County's Sheriff Department—Sheriff Jerry DeWitt, Deputy Burdette Searcey, and Deputy Wayne Price.[4]

On prior appeals, we narrowed the scope of Appellees' claims against Sheriff DeWitt and Deputies Searcey and Price to reckless investigation, manufacture of false evidence, and conspiracy.  We also found that the officials were not entitled to qualified immunity.  The case then proceeded to trial where it initially ended in a mistrial.  After that, the district court, pursuant to Fed. R. Civ. P. 54(b), certified its rulings on county liability and the conspiracy claims for appellate review.  We reversed the district court on both claims, finding that Gage County could be liable

---

[2]We refer to them collectively as the "Appellees."  During the pendency of these proceedings, Ada JoAnn Taylor changed her name to Ada JoAnn Custard.

[3]Joseph White is now deceased.  His wife, Lois White, is the representative of his estate in these proceedings.

[4]Richard Smith, the former Gage County attorney, was among the others initially sued.  We affirmed the district court's finding that he was entitled to absolute immunity and dismissed him from the suit.  Winslow, 696 F.3d at 739.  DeWitt, Searcey, and Price are the only individuals who remain in the suit.

for acts committed under policies instituted by Sheriff DeWitt, as county sheriff, and that the conspiracy claims could go forward.[5]

Appellees once again proceeded to trial after three interlocutory opinions from this Court. This time the trial ended in a verdict and awards for each of the Appellees totaling approximately $28.1 million. The verdict is summarized in the chart below:

| | Dean | White | Gonzalez | Winslow | Taylor | Shelden |
|---|---|---|---|---|---|---|
| Searcey (Reckless Investigation) | Dean | White | Gonzalez | Winslow | Taylor | Shelden |
| Price (Reckless Investigation) | Dean | Price | Price | Price | Taylor | Shelden |
| DeWitt (Reckless Investigation) | DeWitt | DeWitt | DeWitt | DeWitt | DeWitt | DeWitt |
| | | | | | | |
| Searcey (Manufactured Evidence) | Searcey | White | Gonzalez | Winslow | Taylor | Searcey |
| Price (Manufactured Evidence) | Dean | White | Gonzalez | Price | Price | Shelden |
| DeWitt (Manufactured Evidence) | DeWitt | DeWitt | DeWitt | DeWitt | DeWitt | DeWitt |
| | | | | | | |
| Searcey (Conspiracy) | Searcey | Searcey | Searcey | Searcey | Searcey | Searcey |
| Price (Conspiracy) | Price | Price | Price | Price | Price | Price |
| DeWitt (Conspiracy) | DeWitt | DeWitt | DeWitt | DeWitt | DeWitt | DeWitt |
| | | | | | | |
| County Liability | Dean | White | Gonzalez | Winslow | Taylor | Shelden |
| | | | | | | |
| Damages | $2,190,000 | $7,300,000 | $2,190,000 | $7,300,000 | $7,300,000 | $1,825,000 |

On this appeal, Gage County, Searcey, and Price raise four distinct claims in their opening brief, with the continued viability of our prior rulings being their

---

[5]DeWitt, Searcey, and Price also cross-appealed, asking us to re-examine the qualified immunity determination. We found the evidence introduced at the first trial continued to support our prior determination that they should not be granted qualified immunity. Dean, 807 F.3d at 937.

primary focus.[6] Cf. Jenkins v. Winter, 540 F.3d 742, 751 (8th Cir. 2008) ("Claims not raised in an opening brief are deemed waived."). Gage County argues that judgment as a matter of law should be entered for it because our prior opinion on its liability was erroneous and, in any case, liability is not supported by the trial record. The deputies argue much the same with regards to qualified immunity. Failing that, the Appellants argue for a new trial because of (1) allegedly prejudicial behavior by Appellees' counsel; and (2) an alleged failure of the district court to properly define "reckless investigation" in the jury instructions. We address each claim in turn.

II.

As noted above, Gage County launches a two-prong attack on its liability. It first argues that we are not bound by Dean and that we should re-examine that ruling. Alternatively, even if Dean applies, Gage County asserts that the evidence was insufficient to find it liable.

A.

According to Gage County, we are not bound by our holding in Dean under the law-of-the-case doctrine because that decision applied controlling law incorrectly. As a reminder, Dean held that Nebraska county sheriffs "made final policy with regard to law enforcement investigations and arrests." 807 F.3d at 941. For that reason, we held that it was for the jury to decide in this case "whether Sheriff DeWitt's decisions caused the deprivation of rights at issue by policies which affirmatively command that it occur." Id. at 942 (internal quotation marks omitted).[7]

---

[6]We refer to Searcey and Price collectively as the "deputies." We refer to Gage County and the deputies as the "Appellants." Sheriff DeWitt is now deceased. His estate does not appeal from the jury's verdict.

[7]Gage County also suggests that the evidentiary record no longer supports the decision in Dean. Yet, Dean did not hinge its holding on any specific facts; instead, it examined Nebraska law and applicable precedent (including McMillian v. Monroe

Our decision in <u>Dean</u> is not simply law of the case. It is the law of this circuit. Hence, we would only re-examine the decision if it were "repudiated or undermined by later authority, such as a statute, an intervening Supreme Court decision, or en banc decision." Bryan A. Garner et al., <u>The Law of Judicial Precedent</u> 38 (West 2016). It is not. Gage County simply seeks to re-litigate <u>Dean</u> on this appeal. So, the traditional rule applies: "as a decision of a panel . . . [<u>Dean</u>] binds other panels." <u>Jenkins by Agyei v. Missouri</u>, 73 F.3d 201, 205 (8th Cir. 1996).[8]

## B.

Next, Gage County argues that the evidence is insufficient to support a finding of liability. Our review of jury verdicts is extremely deferential given "the danger that the jury's rightful province will be invaded when judgment as a matter of law is misused." <u>Bavlsik v. Gen. Motors, LLC</u>, 870 F.3d 800, 805 (8th Cir. 2017) (internal quotation marks omitted). Thus, we only overturn a verdict when "'the evidence is such that, without weighing the credibility of witnesses, there is a complete absence of probative facts to support the verdict.'" <u>Id.</u> (quoting <u>Browning v. President Riverboat Casino-Mo., Inc.</u>, 139 F.3d 631, 634 (8th Cir. 1998)). With these principles in mind, we examine Gage County's arguments.

A municipal entity, like Gage County, "may not be found liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."

_____

<u>County</u>, 520 U.S. 781 (1997)) to reach its holding that Nebraska county sheriffs were final policymakers in "law enforcement investigations and arrests." <u>Id.</u> at 941. And while it did list certain decisions made by Sheriff DeWitt that a jury could reasonably construe as establishing policy that caused the constitutional violations in this case, it left the ultimate decision to the jury. <u>Id.</u> at 943.

[8]Gage County previously asked this Court to consider <u>Dean</u> en banc. That request was denied. It also petitioned the Supreme Court to hear the case. That request was also denied. <u>See</u> <u>Gage Cnty. v. Dean</u>, 136 S. Ct. 2490 (2016).

S.M. v. Lincoln Cnty., 874 F.3d 581, 585 (8th Cir. 2017) (internal quotation marks omitted). Gage County contends that there is insufficient evidence of causation, arguing that "[t]here is no evidence that DeWitt [as final policymaker] created policy that <u>caused</u> a constitutional violation." Appellant Br. 27.[9] According to the County, the manner in which the jury returned its verdict—finding for Sheriff DeWitt, now deceased, on all counts and finding for all defendants on the conspiracy counts—means that Appellees' "primary theory of municipal liability . . . [which is] that the County was liable because DeWitt, as final policymaker, directly participated in violations of Appellees' constitutional rights or in a conspiracy regarding the same" is no longer valid. And, the County continues, "[t]he record contains *no* evidence of a policy to support any other theory of municipal liability." Appellant Br. 29. To sum up: Gage County argues that there is "*no* evidence" linking the jury's finding of seventeen constitutional torts across the six Appellees to county policy.

We disagree. The jury was correctly instructed—in an instruction that the County did not object to or appeal from—that Gage County was only liable if, after finding a constitutional violation, "Sheriff DeWitt (a) directed that the violation occur, or (b) authorized the violation, or (c) agreed to a subordinate's decision to engage in the violation."[10]

Active involvement in constitutional torts by Sheriff DeWitt, in other words, is not the only evidence probative of the County's liability. The jury found that Sheriff DeWitt did not personally (1) engage in reckless investigatory tactics, (2)

---

[9]In its sufficiency argument, Gage County again takes issue with <u>Dean</u>, asserting that Sheriff DeWitt was not the relevant policymaker at the time of these events and that a Nebraska sheriff is "not a county policymaker." <u>Dean</u> squarely forecloses those arguments, and our discussion in Section II.A and note 7 address why there is no reason to reconsider <u>Dean</u> here.

[10]Gage County did ask for special interrogatories in regards to this instruction. That request was denied by the district court and not appealed here.

manufacture false evidence, or (3) enter into a "knowing agreement or knowing mutual understanding"—a conspiracy as defined in this case—to violate constitutional rights.  But, the jury still found that  he "directed," "authorized," or "agreed to" the constitutional torts committed by the deputies.  See Kelly v. City of Omaha, 813 F.3d 1070, 1076 (8th Cir. 2016) (noting municipal liability attaches if "policymaking officials had notice of or authorized" unconstitutional acts).  Simply put, the jury could have drawn a logical distinction between Sheriff Dewitt's investigatory role and his policymaking and managerial role.[11]  The question, then, is whether there is evidence showing DeWitt created policy which caused at least one constitutional violation—enough for the County to be liable for damages—for each Appellee.

We find that there is not "a complete absence of probative facts," Bavlsik, 870 F.3d at 805 (internal quotation marks omitted), that Sheriff DeWitt "directed," "authorized," or "agreed to" at least one constitutional tort committed against each Appellee.  The jury had sufficient evidence to believe that the investigation would have fizzled out without Sheriff DeWitt's continued approval of arrests.  Evidence at trial showed he allowed the investigation to continue with full vigor despite knowing the deputies arrested individuals who did not match the physical evidence found at the crime scene.  On top of that, the jury could believe he permitted the continued interrogation of arrestees, regardless of the knee-jerk, baffling statements

_____

[11]We find no inconsistency in the distinction the jury drew in the verdict.  But, even if there were one, we have a "duty to harmonize [apparently] inconsistent verdicts when we can."  SEC v. Quan, 817 F.3d 583, 591 (8th Cir. 2016) (alteration in original) (internal quotation marks omitted).  And, specifically, where "a verdict or decision exonerat[es] [an] individual governmental actor[]," we inquire whether that decision can be "harmonized with a concomitant verdict or decision imposing liability on the municipal entity."  Speer v. City of Wynne, 276 F.3d 980, 986 (8th Cir. 2002).  Here, there is no doubt that the verdicts can be harmonized.  As we have articulated above, the jury found liability flowing from Sheriff DeWitt's managerial and policymaking role, but not his investigatory role.

they gave—many of which contradicted physical evidence and statements made by fellow arrestees.  In some cases, it was documented (and shown to the jury) that he approved the arrests of individuals solely on the basis of self-conflicting statements his deputies elicited from those in detention.  In this way, he gave oxygen to the reckless investigation largely led by Searcey and the jury found for all plaintiffs and against Searcey on the reckless investigation claim.[12]  That alone is enough to find the County liable as to all Appellees.  DeWitt's managerial impact, however, was felt in a number of other ways.

Sheriff DeWitt initially opened the investigation.  The jury heard he did so four years after the events in question—and four years after the Beatrice Police Department ("BPD") and the FBI had done an extensive investigation—on the basis of a witness that Deputy Searcey had met while moonlighting as an unpaid private investigator.

Sheriff DeWitt, the jury could believe, knew of the investigatory tactics used and affirmatively directed their usage.  The jury was presented evidence that Sheriff DeWitt sat in on multiple interviews conducted by Deputy Price.  They could reasonably infer he knew of Price's methods, including encouraging subjects to use "unconscious recall" to remember facts.  The jury could also reasonably conclude that DeWitt assigned Deputy Price to speak to stubborn arrestees to elicit favorable, but demonstrably false, statements.

And Sheriff DeWitt, as the district court notes, insulated and protected the investigation.  The jury could have reasonably credited the testimony of BPD Officer Sam Stevens that Sheriff DeWitt acted to protect the investigation from his criticisms and believed this effort eventually led to Stevens's removal from it.

---

[12]We further discuss the reckless investigation led by Searcey in Section III.A.

While this is certainly not all of the evidence of Sheriff DeWitt's hierarchical impact on the investigation, it demonstrates that the jury had enough to find the County liable for the Appellees' damages.

## III.

From county liability we move to another issue that we have ruled on but which is now contested on this appeal: qualified immunity. We first examine whether the trial record continues to support our prior qualified immunity determinations before turning to whether intervening Supreme Court precedent undermines the legal foundation on which our prior rulings rest.

### A.

Qualified immunity is an issue we rarely examine after trial "'because once the defendant has had to proceed to trial, he or she has lost the benefit of qualified immunity, that is, the entitlement to be free from suit.'" Payne v. Britten, 749 F.3d 697, 700 (8th Cir. 2014) (quoting Parton v. Ashcroft, 16 F.3d 226, 228 (8th Cir. 1994)). Prior to trial in this case, and in two separate opinions, we applied the standard qualified immunity test, looking to see (1) if the Appellees had offered facts that sufficiently alleged a constitutional violation, and (2) if the law defining that violation was clearly established. See Winslow, 696 F.3d at 731-40; White, 696 F.3d at 753-59. Based on the record presented to us, we made a legal judgment and answered both questions in the affirmative—which meant that the deputy sheriffs did not have immunity from suit.

Now, after trial—when we have a fully developed record—the "decisive question" is whether the facts continue to support the legal judgments we made previously. See Ortiz v. Jordan, 562 U.S. 180, 184 (2011) (holding post-trial "the defense [of qualified immunity] must be evaluated in light of the character and quality

-10-

of the evidence received in court"). After the 2014 mistrial, we found that "[t]he trial testimony does not support the [deputies'] entitlement to qualified immunity." Dean, 807 F.3d at 937. That statement continues to hold true on the current (and now complete) trial record.

On this appeal, the deputies have offered twelve particularized facts that they argue appeared in White and Winslow, but were not proven at trial. In their eyes, this means our qualified immunity decisions are no longer supported by the facts. Even accepting their dubious argument—that the twelve facts they point to were not proven at trial—and examining the record without them, our holdings in White and Winslow remain amply supported.

After summary judgment, we observed that:

[A] factfinder [could] identify a pattern whereby: Defendants first convinced a suspect that he or she was at the scene of the crime through lies, threats, leading questions, manipulative 'therapy' sessions, and the alleged accusations of several other 'accomplices'; and then if the suspect's blood was not a match for the blood found at the crime scene, Defendants manipulated the suspect into implicating yet another individual, thus beginning the process again.

White, 696 F.3d at 755. On our review of the record, evidence of this "pattern" was borne out at trial, supporting each of the constitutional violations the jury found.[13] The evidence behind each violation is discussed below.

_____

[13]Furthermore, it continues to support our prior determination that the deputies' conduct "shocks the conscience." See Winslow, 696 F.3d at 736; White, 696 F.3d at 758.

The jury found against Searcey, and for all plaintiffs, on the reckless investigation claim. In <u>White</u>, we found that one of the tell-tale signs of a reckless investigation was "evidence that investigators purposefully ignored evidence suggesting the defendant's innocence." 696 F.3d at 758 (internal quotation marks omitted). The jury was shown evidence that quite early in his investigation, Searcey knew that his initial arrestees, White, Taylor, and Winslow, were not matches for the blood found at the crime scene. The jury could have found that, despite professing that the investigation centered on finding evidence of a match to the blood at the crime scene, Searcey "purposefully ignored" the fact that he had no matches and pressed on with his investigation.[14] To be sure, Searcey cannot be liable "merely for aggressively investigating the crime" by continuing the investigation at this juncture. <u>Winslow</u>, 696 F.3d at 734. But, as we describe below, the fact that no match for physical evidence was found before the case was closed—and that the jury was shown that no coherent theory was built or even pursued against White, Taylor, and Winslow—supports the jury's reckless investigation finding against Searcey and for White, Taylor, and Winslow.

After Searcey's investigation hit a wall, having arrested and detained three suspects who did not match the physical evidence at the crime scene, evidence was presented that Searcey turned to a notoriously unreliable witness to provide a spark: Cliff Shelden. Cliff, in turn, implicated his wife, Debra Shelden. The evidence

---

[14]For example, in his initial interview with White, Searcey stated that he was "going to want you know blood test, hair, we maybe even want some sperm," which "would positively identify [White.]" White responded: "Yep. And it can also positively prove I wasn't there." Searcey did the same with Winslow as well. In one of his interviews with Winslow, Searcey told him: "we're looking for a certain type of blood, do you know what type that is?" After Winslow said he did not, Searcey responded that "we're looking for Type B positive."

presented to the jury showed that Cliff told Searcey that Shelden was shoved into a mirror at the crime scene, the mirror broke, and Shelden bled everywhere. A broken mirror was not found at the crime scene. Nevertheless, Shelden was picked up and interviewed by Searcey. During the interview, she confessed to being at the crime scene, but the jury was shown that her confession contained glaring inconsistencies with her husband's statement.[15] More importantly, when her blood was tested the next day, evidence presented to the jury showed that it did not match the blood at the crime scene.

Dean was arrested shortly after Shelden.[16] Dean maintained his innocence for 22 days, and, again, his voluntary blood sample did not match the blood at the crime scene. During the course of interrogating Dean, the jury was shown that Searcey received lab reports confirming that the semen found at the crime scene did not match Winslow or White—his only two suspects with respect to the rape of the victim. Searcey made no attempt to find the source of the semen after this. Instead, he arrested Gonzalez. As the jury heard, Gonzalez proved an imperfect match to the blood found at the crime scene. While she had Type B blood—which was the same type found at the scene—certain genetic markers differed from the sample found at the scene. This meant she was not a match for the blood at the crime scene. The jury heard evidence that Searcey learned and understood this because he received a detailed analysis of Gonzalez's blood from the Nebraska State Police. Gonzalez eventually confessed after her request for DNA analysis of her blood was denied on the grounds that it was cost prohibitive. At that point, the jury was presented

---

[15]For instance, the jury was shown that Shelden never confirmed that she crashed into a mirror. Instead, she claimed that she fell behind the bed. One of the starkest inconsistencies presented to the jury, however, was her arrival time at the crime scene: her husband said Shelden had been with him at the hospital at the time she said she arrived at the crime scene.

[16]We discuss the evidence used to arrest Dean when evaluating the manufactured evidence verdict.

evidence that Searcey's investigation—which he started as unpaid investigator and later continued under official authority as a deputy sheriff—came to an end. The jury was shown that it ended without a single match to the physical evidence at the crime scene. Instead, it was wrapped up with one out of six arrestees, Gonzalez, matching the blood type of the blood found at the scene—but not the actual blood itself.

We find the jury had sufficient evidence that Searcey conducted a reckless investigation as to all six plaintiffs by "purposefully ignor[ing]" the physical evidence—which he admitted was crucial—at the crime scene.

*Reckless Investigation (Price)*

The jury also found for Dean, Taylor, and Shelden on Price's reckless investigation claim.

Based on the evidence presented, in finding for Dean, the jury could have concluded that Price deliberately ignored his protestations of innocence and instead encouraged him to dream up evidence of his presence at the crime scene. In other words, the jury was presented with "evidence of systematic pressure to implicate the defendant in the face of contrary evidence." White, 696 F.3d at 758 (internal quotation marks omitted). For example, evidence at trial showed that, after weeks of Dean protesting his innocence, Price pushed past that and instead found a way for Dean to "reconcile his [unconscious awareness of] being present with the conscious belief that he was not there."

The jury also could have found the same "systematic pressure" at work in finding for Taylor and Shelden. Price had previously treated both of them as a practicing psychologist in Beatrice. Evidence presented at trial, for example, showed he had met with, and evaluated, Shelden when she was considering giving up her

-14-

child.  In the course of that evaluation, he had noted that she "seems to live on a principle by which she acts out impulsively and responds to her actions only if there are negative consequences." And he had previously diagnosed Taylor with borderline personality disorder.[17]

Despite his prior encounters with both Taylor and Shelden in a therapeutic context, Price worked with them both in the course of the investigation.  Evidence presented before the jury suggested that he "counseled" Shelden who "initially . . . had no memory of being at the scene of the crime" into subsequently "remember[ing] all of the events on the night in question."[18]  Price also counseled Taylor after her arrest.  From this, the jury could have reasonably concluded that it was reckless for Price to take advantage of his prior clinical relationship with both Taylor and Shelden in order to get them to speak and implicate themselves in the crime "in the face of contrary evidence." Id.

*Manufacturing Evidence (Searcey)*

The jury found for White, Gonzalez, Winslow, and Taylor against Searcey on the manufacturing evidence claim.  In an instruction that is unchallenged on appeal, the jury was told that three elements must be met to prevail on the manufactured evidence claim.  First, the "Defendant fabricated, that is, made-up, false evidence against one or more of the Plaintiffs during the investigation."  Second, "the Defendant intentionally fabricated false evidence."  And, third, "as a direct result of such action, the Plaintiff suffered some damage."  There was sufficient evidence supporting the findings against Searcey.

_____

[17]Price admitted learning over the course of his treatment of Taylor that she was sexually and physically abused as a child.

[18]This statement was made in an affidavit by Dean's attorney.  Furthermore, Price had one consultation with Shelden for which no records were kept.

For White and Taylor, the jury was presented with evidence of Searcey's false affidavit for arrest. The jury had basis to believe that a number of false statements were included in the affidavit, including a flat-out lie about Winslow corroborating another witness. Given that White and Taylor were arrested on that basis, the jury had ample evidence in finding for them and against Searcey.

As we noted in a prior opinion, "there is evidence that suggests Searcey . . . coached witnesses to supply false evidence about . . . Winslow." Winslow, 696 F.3d at 734. Perhaps the most telling example of this presented to the jury was the supposed identification provided by Taylor which led to Winslow's arrest. After intense interrogation, Taylor was asked to pick from a lineup an individual who was purportedly with her at the crime scene. She was shown four individuals unknown to her, one who Searcey specifically told her was not there, and Winslow whom she knew and had previously told officers she had feared. She picked Winslow and Winslow was arrested on that basis. A jury could reasonably infer from this evidence that the identification was manufactured.

Finally, Gonzalez was arrested because Shelden and Dean had come to believe, based on dreams, that another individual was at the crime scene. Reviewing the evidence at summary judgment, we observed "[a] reasonable inference is that Gonzalez's identification was not a coincidence; instead, a reasonable factfinder could find that Defendants coached or coerced [Shelden] and Dean to implicate Gonzalez." Id. at 733. One example that came out at trial bears this out. The jury was presented evidence showing Shelden and Dean gave wildly differing statements initially as to what they recalled in their dreams. But—in curiously timed recorded statements after prior unrecorded meetings—they both identified similar pieces of clothing that Gonzalez was allegedly wearing. The jury was shown that the arrest warrant filed by Searcey prominently featured that sole bit of corroboration. The jury could reasonably infer from this, and from the sequencing of the interviews and the pattern of recorded versus unrecorded statements, that Searcey "coached or coerced [Shelden] and Dean to implicate Gonzalez." Id.

-16-

The jury found for Dean, White, Shelden, and Gonzalez against Price on the manufacturing evidence claim. In our prior opinions, we held that it was proper for the jury to consider whether the "indoctrination" and pressure placed by Price on some of the Appellees to dream up evidence constituted the manufacture of false evidence. See, e.g., Winslow, 696 F.3d at 733. Similar to what we observed after summary judgment, the jury was presented evidence from which it could infer Price actively cajoled and encouraged certain Appellees, some of whom (like Taylor and Shelden) were mentally infirm, to simply make up evidence from their dreams.

The evidence presented at trial showed that Dean was arrested solely on the basis of a dream that Shelden had after a "therapy" session with Price. Price had told Shelden to "relax" and that she may begin to recall other individuals at the crime scene based on her dreams. After that, she told Searcey she dreamed that Dean was at the crime scene. A reasonable jury—presented with expert testimony that dreams do not constitute tangible evidence—could find that Price deliberately manipulated Shelden to "dream" another name and that Dean was harmed by this because this was the sole basis on which he was arrested. The jury could have also reasonably inferred that Price caused Shelden to manufacture testimony, as was discussed above, that she was at the crime scene when she initially had no memory of being there.

As for Gonzalez, Dean placed her at the crime scene only after speaking with Price. The jury was presented evidence that Price told Dean that evidence of the murder would come back to him in dreams. Indeed, in a recorded interview where he identified Gonzalez, Dean stated that he "remembered [Gonzalez's presence] in [his] sleep." White was perhaps the most impacted by Price's tactics because he insisted on a trial. Evidence presented showed that at White's criminal trial, Dean, Shelden, and Taylor took the stand and testified as to what they were able to gather from their dreams after "working" with Price.

More than sufficient evidence was presented to the jury to find that Price's manipulation through "therapy" caused the manufacture of false testimony which materially affected Dean, Shelden, Gonzalez, and Price.

B.

In addition to the factual findings, the deputies also take aim at the legal conclusions reached in White and Winslow. But, as with Dean, the legal conclusions represent binding precedent. And only if they were "repudiated or undermined by later controlling authority," Garner et al., The Law of Judicial Precedent 38, would we have occasion to revisit them. Such an occasion would be rare indeed because the intervening authority would have to raise questions about the "substance and clarity of pre-existing law"—the state of the law in 1989 in this case. Jordan, 562 U.S. at 190. Appellants do, however, purport to raise such authorities by citing the Supreme Court's decisions in White v. Pauly, 137 S. Ct. 548 (2017), and City & County of San Francisco v. Sheehan, 135 S. Ct. 1765 (2015), both of which, it is argued, raise questions about the "clarity" of the law with regards to reckless investigation in 1989.[17] Stated differently, they do not argue that the Constitution excuses their conduct. Their only point on appeal is that new decisions by the Supreme Court suggest that the unconstitutionality of their acts was not sufficiently clear in 1989.

To start, Pauly and Sheehan do not announce inherently new principles: as Pauly itself stated, the decision "reiterate[d] the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.'" 137 S. Ct. at 552 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). The reason behind this rule, as the Supreme Court has explained, is to ensure public officials can "reasonably . . . anticipate when their conduct may give rise to liability for damages." Ziglar v. Abbasi, 137 S. Ct. 1843, 1867 (2017) (internal quotation marks omitted). While "[i]t

---

[17]The deputies do not (and did not previously) contest that the right to be free from the use of manufactured evidence was clearly established in 1989.

is not necessary, of course, that the very action in question has previously been held unlawful," id. at 1866 (internal quotation marks omitted), the dispositive question is whether there was a "fair and clear warning of what the Constitution requires," Sheehan, 135 S. Ct. at 1778 (internal quotation marks omitted).

Nothing in these cases alters the conclusion we reached in our prior opinions. In both White and Winslow, we examined the deputies' actions and found that a jury could believe that they "conducted a conscience-shocking reckless investigation . . . that was used to box" Appellees in. Winslow, 696 F.3d at 736. And we held—relying on Supreme Court precedent and this Court's holding in Wilson v. Lawrence County, 260 F.3d 946 (8th Cir. 2001)—that the prohibitions against their actions were clearly established in 1989. The deputies argue that it was improper to rely on "general statements of the law" in reaching the latter conclusion. But, Pauly explicitly reaffirmed that "general statements of the law are not inherently incapable of giving fair and clear warning" so long as "the unlawfulness . . . [is] apparent." 137 S. Ct. at 552 (internal quotation marks omitted). There is no doubt that the conduct we described above and in prior opinions is (and was) unlawful.[20] Indeed, "if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from . . . framing individuals for crimes they did not commit." Limone v. Condon, 372 F.3d 39, 44-45 (1st Cir. 2004). The jury was warranted in concluding that this is exactly what happened through the reckless investigation here.

The prohibition on using official power to frame individuals is deeply embedded in the historical roots of due process. See, e.g., 1 E. Coke, The Second

---

[20]The deputies also suggest our prior opinions ran afoul of Pauly by "look[ing] at all the defendants' conduct collectively." Appellant Br. 48. Our prior opinions, however, identified specific acts by each deputy that ran afoul of the Constitution. As discussed above as well, the evidence at trial was specific enough to highlight individual violations by each deputy.

Part of the Institutes of the Laws of England 44 (1797) (quoting Magna Carta of 1225 as saying "No bailiff from henceforth shall put any man to his open law . . . upon his own bare saying, without *faithful* witnesses brought in for the same" (emphasis added)); see also People v. Isaacson, 378 N.E.2d 78, 82 (N.Y. 1978) (noting "application of due process to outrageous conduct of law enforcement agents such as to warrant a restraint of the government from invoking judicial procedures in obtaining a conviction" is a practice "traceable to Magna [Carta]").[21] The Supreme Court—long before 1989—recognized this as well. See, e.g., Mooney v. Holohan, 294 U.S. 103, 112 (1935) (recognizing a process which "contrived a conviction" violates "fundamental conceptions of justice which lie at the base of our civil and political institutions").

To put it simply, this is not a case like many Fourth Amendment cases, where the "specificity of the rule is especially important" because "officers will often find it difficult to know how" the Constitution applies in "the precise situation encountered." District of Columbia v. Wesby, 138 S. Ct. 577, 590 (2018). Instead, this is an "'obvious case,'" where the "unlawfulness of the [deputies'] conduct is sufficiently clear." Id. The evidence supports the conclusion that the deputies "knowingly violate[d]," id. at 589, the due process rights of the Appellees by applying "systematic pressure" to implicate the Appellees and by "purposefully ignor[ing]" exonerating evidence. White, 696 F.3d at 758 (internal quotation marks omitted). The illegality of this was well-established long before 1989. Thus, our prior determination holds: qualified immunity does not shield the deputies. Wesby, 138 S. Ct. at 589 (holding qualified immunity does not protect the "plainly incompetent or those who knowingly violate the law" (internal quotation marks omitted)).[22]

---

[21] It has been noted that "[b]oth of the Constitution's Due Process Clauses reach back to Magna Carta." Obergefell v. Hodges, 135 S. Ct. 2584, 2632 (2015) (Scalia, J., dissenting) (collecting authorities and cases).

[22] In a post-trial submission, Appellants draw our attention to Manuel v. City of Joliet, 137 S. Ct. 911 (2017). There, the Supreme Court held that the start of legal

-20-

We now turn to whether a new trial is warranted. The denial of a new trial by the district court is reviewed "for a clear abuse of discretion, with the key question being whether a new trial is necessary to prevent a miscarriage of justice." Bamford Inc. v. Regent Ins. Co., 822 F.3d 403, 410 (8th Cir. 2016) (internal quotation marks omitted). The Appellants first argue that the Appellees had an "improper and prejudicial focus on 'actual innocence,'" and thus they were deprived of the right to a fair trial. The district court rejected that argument. We review to ensure the district court was within the bounds of its discretion. Id.

As a threshold matter, we define the scope of our review. While the parties were instructed not to argue "actual innocence," the district court did allow the Appellees to argue that the confessions made during the course of this investigation were false. Appellants do not take issue with this on appeal. And so the existence of witness testimony that goes to the falsehood of the confessions is not grounds for a new trial.[23] Appellants do take issue with three actions undertaken by one attorney

process does not vitiate a claim of unlawful detention under the Fourth Amendment. But, it once again affirmed that "once a trial has occurred, the Fourth Amendment drops out." Id. at 920 n.8.

[23]With one exception, the witness testimony that Appellants point to all goes to the falsehood of the confessions. In addition, much of the testimony counsel points to went unobjected to at trial. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239 (1940) (holding counsel "cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that the comments to the jury were improper and prejudicial"). The one piece of testimony from Appellees' expert, Dr. Richard Leo, that did go to actual innocence is not preserved for our review because Appellants' counsel was specifically asked if she was moving for a mistrial on those grounds and she declined. See Tr. 725. Instead, counsel agreed to the district court's remedy of having the remarks stricken from the record. See Fed. R. Civ. P. 46 ("When the ruling or order is requested or made, a party need only state the action that it wants the court to take or objects to . . . ."). Even if it were preserved for our review, it would not be the basis for a new

for the Appellees during opening and closing. First, Appellants point to a statement made by Appellees' counsel during opening that "[Appellants] won't even acknowledge that [Appellees] are innocent." Second, during closing, the same lawyer used a slide that said "innocent." And, finally, counsel asked the Appellees and their families to stand during closing arguments.

The first two actions were timely objected to. The last action was not objected to at the time and was only cited in a mistrial motion over three hours after the case was submitted to the jury. It is not preserved for our review. See Ventura v. Kyle, 825 F.3d 876, 884 (8th Cir. 2016)(noting that where alleged misconduct occurs during closing argument, "counsel . . . should[] make his objection, take his exception, or ask for remedial action at the close thereof and before the case is submitted to the jury" (alterations in original) (internal quotation marks omitted)), cert. denied, 137 S. Ct. 667 (2017) .

In all, we examine whether (1) the reference to innocence in the opening and (2) the use of the "innocent" slide during closing warrant a new trial.

A.

When the actions and statements by counsel are submitted as the basis for a new trial, we examine four factors while keeping in mind that "the district court is in the best position to determine whether the alleged error affected the substantial rights of any party sufficient to warrant a new trial." Townsend v. Bayer Corp., 774 F.3d 446, 460 (8th Cir. 2014) (internal quotation marks omitted). First, we consider whether the actions were "minor aberrations made in passing." Kyle, 825 F.3d at 885 (internal quotation marks omitted). Next, we examine whether "the district court took specific curative action." Id. (internal quotation marks omitted). Third, we look at whether "the size of the damage award . . . suggest[s] that counsel's comments had

---

trial for the reasons we articulate in Section IV.A.

a prejudicial effect." Id. (alterations in original) (internal quotation marks omitted). And, finally, we examine the overall trial record—the "weight of the evidence"—to determine "whether the improper argument deprived a party of a fair trial." Id. (internal quotation marks omitted).

In this case, only the first factor weighs in favor of Appellants. In their brief, Appellees admit that "actual innocence was properly a damages issue," which forecloses a conclusion that the statements at issue were simply made off the cuff. The rest of the factors, however, weigh against Appellants. The district court took specific curative actions. For example, after the "innocent" slide went up during closing, the district court stated: "Ladies and gentlemen, you've been instructed that it's not your responsibility and you should not try to determine whether plaintiffs are guilty or innocent. Take that thing down please." See Tr. 4042; see also Tr. 45 (similar instruction given in opening).[24] The specific curative instructions in this case went beyond the simple "reminder that counsel's arguments are not evidence" that we have previously found insufficient. See, e.g., Gilster v. Primebank, 747 F.3d 1007, 1012 (8th Cir. 2014) (finding general reminder about counsel's argumentation insufficient as a curative instruction). The size of the award in this case, as well, does not indicate prejudice. It was below what Appellees' counsel argued for in closing, suggesting that the remarks and slide did not inflame the passions of the jury. At closing, Appellees' counsel asked the jury to award $500,000 per year spent in prison for each individual Appellee. No individual Appellee received an award equaling $500,000 per year in prison—in fact, some, like Joseph White, were awarded sums significantly less than that.[25]

---

[24]The district court sanctioned the attorney involved. In addition, Appellants did not walk away from trial with clean hands: they, too, were reprimanded during closing for bringing up "actual innocence." See Tr. 4085-86 (district court twice instructing jury not to consider "guilt or innocence" during Appellants' closing).

[25]The district court correctly notes that the overall award pales in comparison to other similar cases.

In the end, we are convinced that a "miscarriage of justice," Regent Ins. Co., 822 F.3d at 410, did not occur because of the overwhelming evidence in this case. Unlike Kyle, this was not simply a "credibility contest" between the Appellees and Appellants. 825 F.3d at 885; see also Primebank, 747 F.3d at 1013 (finding record indicated remarks had prejudicial effect where the district court noted it was a "'tough case'" that "'could go either way'"). The record here is replete with concrete historical evidence—affidavits, memos, interview transcripts—supporting the Appellees' claims and supplementing the credible testimony in this case. We decline to disturb the district court's judgment that a new trial is not warranted because of alleged improper actions and remarks.

## B.

The Appellants' second basis for a new trial is that the reckless investigation instruction improperly included reference to the gathering of "unreliable" evidence. They argue that this allowed the jury to find liability on the basis of negligence, rather than recklessness. Only if an error in the jury instructions "misled the jury or had a probable effect on its verdict" will we order a new trial on that basis. Acuity v. Johnson, 776 F.3d 588, 596 (8th Cir. 2015) (internal quotation marks omitted).

Here, there was no error. The instruction explicitly stated that the jury must find, as a required element, that the "Defendant acted recklessly in gathering such [false or unreliable] evidence." It then went on to define "recklessly" as "when the person proceeds without heed or concern for the consequences." On our review, "jury instructions must be read as a whole." Ryther v. KARE 11, 108 F.3d 832, 846 (8th Cir. 1997) (en banc). In order to accept Appellants' argument here, we would have to believe that jurors stopped "*reading* after the complained-of sentence." Id. As in Ryther, we reject this argument. This court "presume[s] juries to be composed of prudent, intelligent individuals, and we will not speculate whether jurors disregard the court's instructions of law or their oaths." United States v. Harper, 466 F.3d 634, 647 (8th Cir. 2006). The intricate and thoughtful verdict in this case only strengthens that presumption. We decline to order a new trial on the basis of the jury instruction.

V.

To conclude, we note that there are certain types of law enforcement conduct that "do more than offend some fastidious squeamishness or private sentimentalism about combatting crime" and which the Constitution forbids. <u>Rochin v. California</u>, 342 U.S. 165, 172 (1952). Over the course of now four opinions, and our multiple meticulous reviews of the evidence presented, we have recognized this case is an example of such conduct—and a jury has agreed. For this, § 1983 offers a measure of recourse. Indeed, the only measure of recourse: "[f]or people in [Appellees'] shoes, it is damages or nothing." <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388, 410 (1971) (Harlan, J., concurring).

Having carefully reviewed the record and claims on appeal, we affirm.

_____