FILED
United States Court of Appeals
Tenth Circuit

July 5, 2024

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

HOLLIS ANN WHITSON, as guardian ad litem for Peatinna Biggs,

     Plaintiff - Appellant,

v.

THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF SEDGWICK; SHERIFF CARLTON BRITTON, in his official capacity; THOMAS HANNA, in his individual and official capacities; LARRY NEUGEBAUER, in his individual and official capacities,

     Defendants - Appellees,

------------------------------------------

RIGHTS BEHIND BARS; NATIONAL POLICE ACCOUNTABILITY CENTER; THE SOUTHERN CENTER FOR HUMAN RIGHTS; MACARTHUR JUSTICE CENTER,

     Amici Curiae.

No. 23-1084

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:18-CV-02076-DDD-SKC)**
_____

Sean Ouellette, Public Justice, Washington, D.C. (Ellen Noble and Alexandra Z. Brodsky, Public Justice, Washington, D.C., and David Fisher and Jane Fisher-Byrialsen, Fisher & Byrialsen, PLLC, Denver, Colorado, with him on the briefs), for Appellants.

Jonathan N. Eddy (Eric M. Ziporin, with him on the brief), SGR, LLC, Denver, Colorado for Appellees.

Jessica Ring Amunson and Mary Marshall, Jenner & Block LLP, Washington, D.C.; filed a brief on behalf of Appellants, for Amici Curiae Rights Behind Bars, The National Police Accountability Project, The Southern Center for Human Rights, and The Macarthur Justice Center.

_____

Before **HARTZ**, **PHILLIPS**, and **CARSON**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Sheriff Thomas Hanna of Sedgwick County, Colorado, sexually assaulted an intellectually disabled prisoner while transporting her between county jails. The victim, Peatinna Biggs, filed this civil-rights suit under 42 U.S.C. § 1983 by and through her guardian ad litem, Plaintiff Hollis Ann Whitson, against Sedgwick County, the Sedgwick County Sheriff's Department, and Sheriff Hanna in his individual and official capacities. The district court granted the motion of the County and the Sheriff's Department (the municipal defendants) to dismiss the complaint against them, reasoning that the County could be liable only if "the challenged conduct [had] been taken pursuant to a policy adopted by the official or officials," and "Hanna's actions were not pursuant to Department policies, but in direct contravention of them." *Whitson v. Bd. of Cnty. Comm'rs* (*Whitson I*), No. 18-CV-02076, 2020 WL 13660757, at *5 (D. Colo. Apr. 17, 2020) (internal quotation marks

omitted). Hanna was then found liable by a jury in his individual capacity. Whitson appeals the dismissal of the claims against the municipal defendants, which are legally equivalent to claims against Hanna in his official capacity.

Exercising jurisdiction under 28 U.S.C. § 1291, we reverse. Sheriff Hanna's actions fell within the scope of his policymaking authority regarding the custody and care of prisoners and subjected the municipal defendants to liability.

## I.     BACKGROUND

### A.     Factual Background

Because the district court dismissed the claims against the municipal defendants on the ground that the complaint failed to state a claim against them, we assume the truth of the factual allegations of the complaint. *See Gann v. Cline*, 519 F.3d 1090, 1092 (10th Cir. 2008). On August 10, 2016, Ms. Biggs was incarcerated in the Sedgwick County Jail. She is an adult with an intellectual disability. The jail was run by Sheriff Hanna, the highest ranking law-enforcement officer in Sedgwick County. Hanna told his Deputy Sheriff Larry Neugebauer that he was going to transfer Ms. Biggs to the Logan County Jail using his personal vehicle.[1] Hanna gave Ms. Biggs her street clothes and ordered her to change into them. "Deputy Neugebauer knew it was highly unusual to have an inmate change . . . into street

---

[1] At Hanna's trial there was evidence that Sedgwick County had previously followed the "Matron Program," which required a female to accompany all female detainees during jail transports by male officers, but Hanna discontinued the program. *See Whitson v. Hanna* (*Whitson II*), No. 118-CV-02076, 2023 WL 2570224, at *5 (D. Colo. Mar. 6, 2023).

clothes before being transferred." Joint App. at 25. At about 12:15 p.m. he saw Sheriff Hanna load Ms. Biggs, who was handcuffed, into the front passenger seat of his vehicle.

Instead of transporting her to the Logan County Jail, Sheriff Hanna brought Ms. Biggs into his home. With a gun in his holster, he offered to pay her $60 to have sex with him. She refused. He then sexually assaulted her. His gun remained visible on a coffee table throughout the assault. After the assault Hanna "threatened Ms. Biggs that if she told anyone about what he had done she would spend the rest of her life in prison." *Id*. at 27. At about 12:51 p.m. he told the dispatcher that he was taking Ms. Biggs to the Logan County Jail. After driving her there he deposited $20 into her commissary account.

While the assault was occurring, Deputy Neugebauer drove past Hanna's house on his way to and from his lunch break and saw Hanna's empty vehicle parked outside his home on both occasions. He reported the incident to the Logan County District Attorney's Office on August 22. Because of the threat by the sheriff, Ms. Biggs had not reported the incident. The District Attorney opened an investigation, and two days later Hanna was criminally charged with sexual assault on an at-risk adult, sexual conduct in a correctional institute, soliciting prostitution, and first-degree official misconduct. Hanna was later removed from office.

Neither the County of Sedgwick nor the Sedgwick County Sheriff's Department had any policy in place to oversee and monitor the actions of Sheriff Hanna. "This lack of oversight allowed former Sheriff Hanna's actions to go

unchecked and unmonitored throughout his term as the highest ranking law enforcement officer." Joint App. at 33.

### B.    Procedural Background

Plaintiff Whitson filed suit in the United States District Court for the District of Colorado against multiple defendants, including the municipal defendants and Sheriff Hanna in his individual and official capacities.[2] After the district court granted the municipal defendants' motions to dismiss, the claims against Hanna proceeded to trial. The jury rendered an $8.25 million verdict against him in compensatory and punitive damages.

The original judgment was entered against Hanna in his individual and official capacities. Plaintiff Whitson moved to alter or amend the final judgment to explicitly bind the municipal defendants, pointing out that the judgment against Sheriff Hanna in his official capacity is a judgment against the municipal defendants. *See Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("Suing individual defendants in their official capacities under § 1983 . . . is essentially another way of pleading an action against the county or municipality they represent."). The municipal defendants, in

---

[2] The district court ruled that Sedgwick County is not a proper defendant in the case because "[p]ursuant to the Colorado Constitution, the County is a separate and distinct entity from the Sheriff's Department [and] . . . does not have the legal authority to control or supervise the Sheriff and the Sheriff's deputies." *Whitson I, 2020 WL 13660757,* at *5. This decision should be reconsidered on remand. *See Chavez v. Bd. of Cnty. Comm'rs.*, 426 F. Supp. 3d 802, 813 (D. Colo. 2019) ("[W]hen a *Monell* claim is based on a sheriff-made policy, any distinction between suing the sheriff's office versus suing the county becomes purely theoretical, because the county will pay regardless.").

turn, moved to clarify the judgment to say that the official-capacity claims did not survive the motions to dismiss. The district court granted the municipal defendants' motion, concluding that Hanna's conduct could not be imputed to the municipality because "the assault was wholly unrelated to the realm of his grant of authority with respect to transportation of prisoners" and he was "advancing a purely personal agenda." *Whitson v. Hanna* (*Whitson II*), No. 118-CV-02076, 2023 WL 2570224, at *4 (D. Colo. Mar. 6, 2023) (internal quotation marks omitted).

## II.     DISCUSSION

### A.     Liability of municipal defendants

The central question before us is whether a final policymaker's assault of a county prisoner in the course of carrying out official duties for which he was charged with setting policy subjects the municipal defendants to liability. We answer yes.

A municipal government is not liable for every constitutional violation by one of its officers or employees. Although a municipality is a "person" subject to suit under § 1983 for constitutional violations, it "cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Rather, a municipality is responsible only for (1) actions taken by subordinate employees in conformity with preexisting official policies or customs and (2) actions taken by final policymakers, whose conduct "can be no less described as the official policy of a municipality." *Seifert v. Unified Gov't of Wyandotte Cnty./Kansas City*, 779 F.3d 1141, 1159 (10th Cir. 2015) (internal quotation marks

omitted); *see Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1283 (10th Cir. 2007) (Gorsuch, J.) (While municipalities are liable for official policy decisions, "this is hardly the only basis available for assigning municipal liability." Municipalities are "equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules."); *id.* at 1287 ("Actions taken by a municipality's final policymakers, even in contravention of their own written policies, are fairly attributable to the municipality and can give rise to liability.").

The motive of the policymaker is irrelevant. The important thing is that the policymaker is responsible for an unconstitutional act. As the Supreme Court has said:

> [P]roof that a municipality's legislative body or *authorized decisionmaker* has intentionally deprived a plaintiff of a federally protected right *necessarily establishes* that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality *or its authorized decisionmaker itself violates federal law* will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997) (emphasis added); *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion of Justice Brennan) (municipal liability may attach to "a single decision to take unlawful action made by municipal policymakers."). The decision on which liability is based need not "reflect[] implementation of a generally applicable rule," *Brown*, 520 U.S. at 406, which is how we usually think of a policy decision. As we stated in *Simmons*, "An act by a municipality's final policymaking authority is no less an act of the institution than the act of a subordinate employee conforming to a preexisting policy or

Page **7**

custom," 506 F.3d at 1285, and therefore "[a]ctions taken by a municipality's final policymakers . . . are fairly attributable to the municipality," *id.* at 1287.

One must keep in mind, however, that "'municipal liability attaches only where the decisionmaker possesses *final authority* to establish municipal policy *with respect to the action ordered*.'" *Beedle v. Wilson*, 422 F.3d 1059, 1068 (10th Cir. 2005) (brackets omitted and emphasis added) (quoting *Pembaur*, 475 U.S. at 481 (plurality opinion of Brennan, J.)). Only then can we say that the final policymaker's actions "are fairly attributable to the municipality." *Simmons*, 506 F.3d at 1287. A municipality is an artificial person. But in certain respects it can be identified with the final policymakers who have authority to control its actions. As we understand controlling precedent, when an official takes action over which he or she has final policymaking authority, the policymaker *is* the municipality, so it is fair to impose liability on that entity for that action.

In *Simmons* the administrator of a county nursing home brought a § 1983 action alleging unlawful termination by the board of the county's health-care special-services district that operated the nursing home. *See id.* at 1283. The trial court held that the health-care district could not be held liable because the alleged constitutional violation by the board in terminating the administrator violated the board's own reduction-in-force (RIF) policy. We rejected that defense, conducting a two-step inquiry: "It is undisputed before us that the Board was the final policymaker on personnel matters for the District. It is also undisputed that Ms. Simmons's employment was terminated pursuant to the Board's own actions." *Id.* at 1286.

Because the Board possessed final authority over the unlawful action, the decision was "no less chargeable as an official act of the District than one taken pursuant to the District's written RIF policy." *Id.* Otherwise, municipalities would be immune from liability whenever their policymakers abused the authority conferred on them. "Such a rule of law would . . . serve to undermine rather than enhance Section 1983's purposes." *Id.* at 1285.

So too here. Sheriff Hanna was the final policymaker for the municipal defendants with respect to the care of county prisoners, including their transportation. By Colorado statute the sheriff "shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer." Colo. Rev. Stat. Ann. § 30-10-511; *see Whitson II*, 2023 WL 2570224, at *4 ("[I]t is undisputed that transportation of prisoners is within the realm of the county sheriff's policymaking authority."). Hanna's actions with respect to prisoner Biggs were undoubtedly within the scope of activities for which he was to set policy.

Our conclusion in this case finds strong support in the decisions by other circuits. Those decisions have repeatedly held that a policymaker need not be motivated by legitimate policy goals for conduct to fall within final policymaking authority. We discuss several such decisions.

In *Bennett v. Pippin*, 74 F.3d 578 (5th Cir. 1996), a county sheriff raped an attempted-murder suspect after an interrogation at her home. *See id.* at 583–84. Although the court of appeals reversed the judgment against the county because it

had been denied its right to a jury trial, it rejected the county's argument that it could not be liable for the rape "because the Sheriff's actions did not constitute a policy of the County . . . because they violated well-established County policy." *Id.* at 585–86. The court explained that "a single decision may create municipal liability *if* that decision were made by a final policymaker responsible for that activity." *Id.* at 586 (internal quotation marks omitted). "When a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, the existence of a well-established, officially-adopted policy will not insulate the municipality from liability." *Id.* (internal quotation marks omitted). The sheriff's "actions were those of the County" because "the county sheriff is the county's final policymaker in the area of law enforcement" and "his relationship with [the victim] grew out of the attempted murder investigation and . . . he used his authority over the investigation to coerce sex with her." *Id.* (internal quotation marks omitted). The court concluded that "[t]he fact that rape is not a legitimate law enforcement goal does not prevent the Sheriff's act from falling within his law enforcement function." *Id.* We do not see how that decision could be consistent with the position of the municipal defendants in this case.

For similar reasons the court of appeals in *Turner v. Upton Cnty., Tex.*, 915 F.2d 133 (5th Cir. 1990), rejected the county's argument that it could not be liable for a county sheriff's decision to conspire to subject the plaintiff "to trial on false charges bolstered by fabricated evidence and perjured testimony," and to attempt "to coerce her to change her plea from not guilty to guilty." *Id.* at 135. "Where a *final*

Page **10**

policymaker abuses the powers vested in his position to the detriment of a citizen," said the court, "that abuse can be the basis for suit being brought [against the county] under section 1983." *Id*. at 137 n.3.

The Sixth Circuit has also recognized that a municipality may be liable for a single act of misconduct by a policymaker that was not authorized by some general policy. In *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1117 (6th Cir. 1994), a city employee was fired in violation of his right to free speech for making statements criticizing affirmative action. Observing that "[n]o municipal official in his right mind would advocate . . . a general policy [of disciplining City employees for exercising their rights of free speech]," the court said that the city would be liable even for an "isolated incident" so long as the decision to punish the employee for exercising his constitutional rights "was made by the government's authorized decisionmakers." *Id.* at 1117–18 (internal quotation marks omitted). And in *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009), the circuit court held that the city "may be held liable under § 1983 for the failure to disclose exculpatory evidence and the destruction of evidence from [the plaintiff's] first trial, even though those actions were not taken pursuant to an overarching policy," so long as the decisionmaker was "responsible for establishing final government policy respecting [the] activity." *Id.* at 394 (internal quotation marks omitted).

Similar misconduct by the ultimate policymaker led the Eighth Circuit to affirm municipal liability in *Dean v. Searcey*, 893 F.3d 504 (8th Cir. 2018). In that case the Sheriff "gave oxygen" to a "reckless investigation" by knowingly approving

improper investigatory tactics including wrongful arrests and interrogations. *Id.* at 512–13. And recently, in *Felts v. Green*, 91 F.4th 938 (8th Cir. 2024), the court upheld the liability of the City of St. Louis based on the decision of the president of the Board of Aldermen to block from his official Twitter account a citizen who had criticized him. It explained that "[m]unicipal liability may be imposed for a single decision by municipal policymakers who possess final authority to establish municipal policy with respect to the action ordered." *Id.* at 942 (internal quotation marks omitted). The president's "unilateral" and "unreviewable" decision to block a user who personally criticized him was therefore imputed to the municipality. *Id.* at 944. *But cf. Dahl v. Rice Cnty., Minn.*, 621 F.3d 740, 743 (8th Cir. 2010) (County was not liable for an incident in which the sheriff lost his temper with a deputy and struck him in the chest. "Although a policy can be inferred from a single decision, no such deliberative action occurred. There is no evidence that this single incident of [the sheriff] losing his temper represents a policy of [the sheriff for the county]." (internal quotation marks omitted)).

Two more appellate decisions complete our survey. In *Botello v. Gammick*, 413 F.3d 971 (9th Cir. 2005), the Ninth Circuit held that the county could be liable for the efforts of the district attorney to retaliate against the exercise of free-speech rights by a former investigator. The district attorney allegedly tried to sabotage the plaintiff's future job prospects by calling a future employer "to dissuade it from hiring [the plaintiff]" by making "false allegations about [the plaintiff's] character and performance at his previous job." *Id.* at 974. The court held that the district

attorney's "administrative acts" were taken in the prosecutor's capacity "as a policymaker for the County." *Id.* at 979. And the Eleventh Circuit in *Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989), affirmed that the county delegated to a physician's assistant "final policymaking authority with respect to medical affairs at [a] road prison," *id.* at 793, so that the county was liable when the physician's assistant provided "grossly deficient [medical] treatment" resulting in permanent physical impairment to the plaintiff, *id.* at 787; *see id.* at 794.

The circuit-court decisions relied upon by the district court and municipal defendants are readily distinguishable from the case before us because the public official was not specifically charged with regulating (and setting policy for) the activity on which the claim was based.

Thus, in *Lankford v. City of Hobart*, 73 F.3d 283 (10th Cir. 1996), where the municipality was held not liable for the police chief's "private, rather than public, acts of sexual harassment" against two dispatchers, *id.* at 287, the chief "had no authority to make any policy on behalf of the City including terms or conditions of employment," *id.* at 285 (internal quotation marks omitted). The lack of final policymaking authority easily doomed any claim that the municipality was liable.

In *Starrett v. Wadley*, 876 F.2d 808 (10th Cir. 1989), the county assessor made repeated sexual advances toward a female deputy assessor, often while intoxicated. *See id.* at 812. He became "hostile" toward her and "scrutinize[d] her work more closely than the work of other employees" when she rebuffed his advances, and he eventually terminated her. *Id.* She sued the county assessor and the county under 42

Page **13**

U.S.C. § 1983 for retaliatory firing and sexual harassment.[3] *See id.* at 811. This court imputed liability to the county for her termination but not for the sexual harassment. It explained that the county assessor's "act of firing plaintiff was an act of the County because [he] had final authority to set employment policy as to the hiring and firing of his staff." *Id.* at 818. But the assessor's sexual misconduct was disconnected from his official authority. "Those acts did not concern any official terms of employment, such as job title or description, salary levels, or other conditions that Wadley could establish only because the County delegated final policy authority over those matters to him." *Id.* at 820. We said that "the County should not be liable for [the assessor's acts of harassment] unless they were so widespread and pervasive as to establish a 'custom' within his office." *Id.* (Indeed, the jury had been instructed that the County would be liable for the assessor's acts of sexual harassment only if they "were part of a pattern of action sufficient to establish custom or policy" of the County. *Id.* at 819 n.16.).

*Roe v. City of Waterbury*, 542 F.3d 31 (2d Cir. 2008), is the principal case relied on by both the district court and the municipal defendants for the proposition that a municipality is not liable for unconstitutional action by the policymaker when the policymaker (in that case, a mayor) is pursuing purely personal ends. The facts in that case, however, are, to say the least, unusual. Before he was elected mayor of the City of Waterbury, Philip Giordano met a woman who "provided Giordano with

---

[3] The plaintiff also sued under Title VII, but the analysis of that claim is not relevant to this case.

sexual favors in exchange for money." *Id.* at 34. After being elected mayor he continued to see the woman and eventually asked that she "introduce younger women to him." *Id.* She brought two pre-teens to him and, for nearly a year, Giordano sexually abused them "on numerous occasions at the mayor's office, at his home, and in his city-issued police cruiser." *Id.* at 33. To arrange the sexual encounters, he used cell phones paid for and issued by the City. *See id.* at 34. The children sued Giordano and the City of Waterbury. While Giordano was held liable in his personal capacity, the Second Circuit affirmed the dismissal of claims against the City. *See id.* at 41.

The "critical inquiry" was "whether the government official [was] a final policymaker with respect to the particular conduct challenged in the lawsuit." *Id.* at 37. The plaintiffs argued that the mayor was the "final policymaker of the City in the areas of law enforcement, safety, and social issues; and as a result he had final policymaking authority over the area of conduct that included his abusive acts." *Id.* The court was not persuaded, explaining that "decisions to sexually abuse young children . . . are not in any way related to the City's interests." *Id.* at 38. Although the mayor had "generally broad" policymaking authority, "a finding of general policymaking power on the part of the Mayor was not sufficient for municipal liability to attach" because he had no "policymaking authority with respect to the acts of sexual abuse he committed." *Id*. "An official acts wholly outside his official policymaking capacity," said the court, "when he misuses his power to advance a purely personal agenda." *Id.* at 41.

We have no quarrel with the outcome in *Roe*. The mayor's interactions with the two children had nothing to do with his official duties. The only connections between his being mayor and his sexual assaults were that he arranged to be with the children by making calls on his mayoral cell phone and some of the assaults were in his office and his official car. It would be quite a stretch to say that the mayor "possesse[d] final authority to establish municipal policy with respect to" his actions with the children. *Beedle*, 422 F.3d at 1068 (internal quotation marks omitted). On the other hand, we see no support for the proposition that conduct by a policymaking official that would otherwise lead to municipal liability cannot be attributed to the municipality when the official acts for purely personal reasons. The Supreme Court has spoken forcefully on the issue, saying, "proof that a municipality's legislative body or *authorized decisionmaker* has intentionally deprived a plaintiff of a federally protected right *necessarily establishes* that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality *or its authorized decisionmaker itself violates federal law* will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Brown*, 520 U.S. at 405 (emphasis added). A rule under which a municipality could escape liability whenever a policymaker motivated by purely personal considerations violates constitutional mandates would "serve to undermine rather than enhance Section 1983's purposes." *Simmons*, 506 F.3d at 1285.

The factual context presented by this case is quite different from the contexts of the cases offered to dispute municipal liability. Here the victim was *in the custody*

of the official and the official was statutorily charged with supervising the victim's care. *See* Colo. Rev. Stat. Ann. § 30-10-511 (the sheriff "shall have charge and custody of the jails of the county, and of the prisoners in the jails, and shall supervise them himself or herself or through a deputy or jailer."). In this circumstance, we see no escape from the conclusion that Sheriff Hanna possessed "final authority to establish municipal policy *with respect to the action ordered*." *Beedle*, 422 F.3d at 1068 (emphasis added and internal quotation marks omitted). Indeed, he had not only the authority, but the responsibility, to set policy with respect to the treatment of prisoners in his custody.

A few words about the dissent. It suggests that it is bad policy to expose a municipality to what could be enormous liability for actions by policymakers who are motivated solely to achieve personal gratification without any intent to serve the municipality's interest. It therefore rejects the appellate decision holding a municipality liable for sexual assaults by a sheriff. And it appears to distinguish the other out-of-circuit decisions cited above in support of our approach on the ground that the misconduct may not have been motivated just by the desire for self-gratification (perhaps because conduct motivated solely by personal reasons is not considered within the scope of employment). But the misconduct in those cases may well have been motivated by purely personal concerns—for example, did the sheriff fabricate evidence because of a personal vendetta against the defendant or did the alderman infringe the free-speech rights of a constituent only to protect his personal reputation—and, more importantly, the opinions in those cases did not address

**Page 17**

motive, presumably because the motive was irrelevant. If liability depends on whether there is a possible "proper" motivation for the official's action, the likely unseemly consequence is that the only victims who cannot obtain relief from a municipality for a policymaker's misconduct are victims of sexual assault, for which there could never be a legitimate motive. Would that be such good policy?

In any event, the theory of municipal liability we are imposing is hardly a stranger to the law and is fully consistent with *Monell*. *Monell* rejected respondeat superior liability for municipalities. In other words, a municipality would not be liable simply because of misconduct by employees acting within the scope of their employment. Rather, the conduct must be "fairly attributable to the municipality." *Simmons*, 506 F.3d at 1287. We said above that "when an official takes action over which he or she has final policymaking authority, the policymaker *is* the municipality, so it is fair to impose liability on that entity for that action." *Supra* at 8. In other words, when the policymaker is the alter ego of the municipality, liability is appropriate, regardless of the miscreant's motives or whether the conduct was within the scope of employment. The Supreme Court has recognized this narrow basis of liability outside of respondeat superior. Outlining relevant agency law in the course of determining when an employer can be liable under Title VII for a hostile work environment, the Court noted that an employer can be liable "even where employees commit torts outside the scope of employment," when the employee's "high rank in the company makes him or her the employer's alter ego." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 758 (1998). Surely, a municipality can be liable for the torts

Page **18**

of its alter ego. And surely, the Sheriff of Sedgwick County is the alter ego of the Sheriff's Department.

This does not mean that a municipality is liable for all misconduct by a sheriff. If Hanna had raped a customer at a bar after work, there would likely be no municipal liability. As explained above, the sheriff must have final policymaking authority with respect to the actions taken. *See Beedle*, 422 F.3d at 1068. Given that Hanna raped a prisoner in his custody while transporting the prisoner to another jail, that requirement was undoubtedly satisfied.[4]

### B.    Further proceedings

There remains the question whether the municipal defendants are bound by the existing judgment against Hanna under law-of-the-case doctrine or preclusion principles. We leave to the district court to determine in the first instance whether—and, if so, to what extent—the municipal defendants are bound by the existing judgment. We do, however, make two observations that may be of some use. First, the judgment against Hanna includes both compensatory and punitive damages, but punitive damages are not recoverable against the municipal defendants. *See City of Newport v. Fact Concerts*, 453 U.S. 247, 270–71 (1981). Second, there is some support for the proposition that preclusion principles may apply in certain circumstances in the context of a sheriff-municipality relationship. *See Russell v.*

---

[4] The recent decision in *Doe v. Burleson County*, 86 F.4th 172 (5th Cir. 2023), cited by the dissent, is readily distinguishable on this ground. The judge "did not possess final policymaking authority in any area relevant to" the alleged sexual assault. *Id.* at 176.

*SunAmerica Sec., Inc.*, 962 F.2d 1169, 1175 (5th Cir. 1992) (observing that "most other federal circuits have concluded that employer-employee or principal-agent relations may constitute grounds for application of res judicata.").

### III.    CONCLUSION

We **REVERSE** and **REMAND** for proceedings in the district court consistent with this opinion.

23-1084, *Whitson v. Hanna*
**PHILLIPS**, J. dissenting.

I would affirm the district court's dismissal of the claims against Sedgwick County because Sheriff Hanna did not act as a final policymaker in his decision to sexually abuse Ms. Biggs. I agree with the district court's conclusion that Sheriff Hanna advanced a purely personal agenda in committing the sexual assault and acted outside his authorized law-enforcement "realm" of setting policy for the transportation of prisoners. *Whitson v. Hanna* (*Whitson II*), No. 1:18-CV-02076, 2023 WL 2570224 at *4 (D. Colo. Mar. 6, 2023) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995)). As the district court put it so well, sexual assault "is not within the policymaking authority a county sheriff has." *Id.*

I disagree with the majority's characterization that Sheriff Hanna's sexual assault occurred "while transporting [Ms. Biggs] between county jails" and "in the course of carrying out official duties for which he was charged with setting policy[.]" *See* Majority Op. at 2, 6, 19. In fact, Sheriff Hanna interrupted the transport between the county jails by stopping at his house and taking Ms. Biggs into his home to sexually assault her. The jail transport resumed only after he completed the sexual assault.

I agree that Sheriff Hanna had policymaking authority over the jail transportation of detainees like Ms. Biggs, and that legitimately exercising this authority could result in municipal liability under § 1983. For instance, if the sheriff had instructed deputies to tighten handcuffs one extra click during transport out of concern for escape risks and a detainee suffered nerve damage, the sheriff's exercise of policymaking authority should

qualify as municipal policy. Or if concerned that detainee transports were taking too long, the sheriff had instructed deputies not to fasten detainees with safety belts to speed their entry and exit from sheriff vehicles and a detainee was injured in a head-on collision, the sheriff's exercise of policymaking authority should again qualify as municipal policy. The voters may have elected an unsuitable sheriff, but the sheriff, however misguided, would be acting within a sheriff's realm there. But those sorts of policies bear no resemblance to Sheriff Hanna's supposed "policy" of halting detainee jail transport for whatever time he needed to commit a sexual assault. The majority opinion goes too far for me in approving as municipal policy a rogue sheriff's one-time, *secret* action that is unquestionably outside of the sheriff's realm and legitimate policymaking authority.

In justifying its holding, the majority opinion relies on a conglomeration of three distinct categories of final-policymaker cases. In each category, the policymaker is acting under color of law (and is thus suable under § 1983), as Sheriff Hanna was here. In the first category, which by my reading covers the bulk of final-policymaker cases, the policymaker makes wrong decisions—but within the realm of his or her authority—and causes a constitutional injury to another person. In the second category, which involves far fewer cases, the policymaker—again within the realm of his or her authority—acts in his employment in an illegal way, for instance, by falsifying evidence and the like while investigating crimes. In the third category, which involves far fewer cases even yet, the final policymaker acts outside the authorized realm by committing crimes, such as sexual

2

assaults, solely for personal gratification. For these third-category cases, I cannot see how the municipality is the driving force of the constitutional violation.[1]

Though the majority opinion doesn't lack for case citations, the cases from the first two categories offer little help. None of the cited Supreme Court cases concern the third-category situation. So that leaves us with the circuit courts. I dispute the majority's declaration that its "conclusion in this case finds strong support in the decisions by other circuits." Majority Op. at 9.

## I.    The Majority Opinion's Third-Category Cases

As support for its holding, the majority opinion relies heavily on *Bennett v. Pippin*, 74 F.3d 578 (5th Cir. 1996). In *Bennett*, a woman shot her husband after he allegedly assaulted her. *Id.* at 583. The woman was arrested in another county after informing the authorities there. *Id.* The county sheriff drove her back to her house, surveyed the scene of the shooting, then left to attend to other law enforcement duties. *Id.* After arrest and booking, a deputy took the woman home. *Id.* Later, the sheriff returned alone to "assuage [her] previously expressed concern that [her husband's] friends would attack her" and because "he was mildly aroused by the manner in which Ms. Bennett had touched him as

---

[1] The majority opinion notes that "[n]either the County of Sedgwick nor the Sedgwick County Sheriff's Department had any policy in place to oversee and monitor the actions of Sheriff Hanna." Majority Op. at 4. It in turn blames this "lack of oversight," *id.*, for Sheriff Hanna's being "unchecked and unmonitored," *id.* at 5. But the county has limited options, as noted by *Simmons v. Uintah Health Care Special Service District*, 506 F.3d 1281 (10th Cir. 2007), which the majority cites for the proposition that "[m]unicipalities are 'equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their preexisting rules.'" Majority Op. at 7 (quoting *Simmons*, 506 F.3d at 1287).

3

he lit a cigarette for her." *Id.* From there, the sheriff's and woman's accounts greatly differed. *Id.* But at the civil bench trial involving § 1983 claims, the court found that "the Sheriff raped Ms. Bennett in the manner described in her testimony." *Id.* at 584. This testimony included Ms. Bennett's account that the sheriff raped her after telling her that "he was the Sheriff and could therefore do what he pleased." *Id.* at 583. The woman asserted a § 1983 claim against the county alleging that the sheriff had acted as its final policymaker. *Id.* at 581.

The Fifth Circuit began by noting that "[o]ur cases make clear that under *Monell*, a single decision may create municipal liability *if* that decision were made by a final policymaker responsible for that activity." *Id.* at 586 (cleaned up). Next, the court declared that "in Texas, the county sheriff is the county's final policymaker in the area of law enforcement, not by virtue of the delegation by the county's governing body but, rather, by virtue of the office to which the sheriff has been elected." *Id.* (citations omitted). Critically, the court then stated that

> the Sheriff's actions were those of the County because his relationship with Bennett grew out of the attempted murder investigation and because, as we will explain, he used his authority over the investigation to coerce sex with her. The fact that rape is not a legitimate law enforcement goal does not prevent the Sheriff's act from falling within his law enforcement function.

*Id.* (citation omitted).

So if *Bennett* were a Tenth Circuit case, it might well control the present case. But as an out-of-circuit case, *Bennett* must earn its way into our caselaw by its persuasive value. For me, *Bennett* hasn't earned its place. Other circuits have rejected it, and we should too. I agree with the cases below criticizing *Bennett* and declining to follow it.

4

## II.    A Circuit-Court Survey

Below, I collect the cases I have found raising issues akin to those decided in *Bennett* and our present appeal.

In *Wooten v. Logan*, a case the district court relied on but the majority opinion ignores, a "mentally handicapped minor" alleged that the then-sheriff and his female friend, who had befriended the girl's mother, conspired to rape the girl. 92 F. App'x 143, 144 (6th Cir. 2004). Having won the mother's trust, the woman took the minor girl for an overnight stay, but as prearranged, the sheriff activated his lights and stopped the car. *Id.* Soon after, the sheriff and his coconspirator had the girl "engage in oral intercourse, digital penetration and sexual intercourse over a two hour period." *Id.* During the sexual assaults, the sheriff was wearing his uniform, badge, and firearm and acted under his authority as the county's chief law-enforcement officer. *Id.* The sheriff and his woman friend later pleaded guilty to statutory rape. *Id.* The district court granted summary judgment against the plaintiff's § 1983 municipal-liability claim. *Id.* at 145. Specifically, it ruled that "although [the sheriff] was the county's final policymaker with regard to enforcement of the law, [the sheriff's] alleged criminal conduct did not establish or constitute 'a municipal policy.'" *Id.* (cleaned up).

A divided panel of the Sixth Circuit affirmed, ruling that "[t]he district court properly entered summary judgment in favor of the County because [the plaintiff] has not demonstrated that [the sheriff's] conduct represented the 'official policy' of the County, as required for the County to be held liable under § 1983." *Id*. The court acknowledged that "[u]nder appropriate circumstances, a single act by a local government official can

5

constitute the government's 'official policy.'" *Id.* at 146. It noted that this occurs "where the official 'possesses final authority to establish municipal policy with respect to the action ordered.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). But the court ruled that the plaintiff "has not demonstrated that [the sheriff's] conduct represented the 'official policy' of the County, as she has not shown that [the sheriff] was acting in a policymaking capacity when he detained and assaulted her." *Id.* The court commented that holding otherwise would "contravene *Pembaur*'s attempt 'to distinguish acts of the *municipality* from acts of *employees* of the municipality.'" *Id.* at 147 (quoting *Pembaur*, 475 U.S. at 479).

The *Wooten* court considered and rejected the Fifth Circuit's contrary ruling in *Bennett*. *Id.* at 146 n.3. Noting *Bennett*'s holding that "the rape constituted the county's 'official policy,'" *Wooten* characterized *Bennett*'s holding as a "brief analysis [that] could be questioned as effectively providing for *respondeat superior*." *Id.* (citing *Bennett*, 74 F.3d at 586).

Next, in *Roe v. City of Waterbury*, the city's mayor sexually abused minor females "on numerous occasions at the mayor's office, in his home, and in his city-issued police cruiser." 542 F.3d 31, 33 (2d Cir. 2008). He arranged these meetings with a city-paid cell phone. *Id.* at 34. In pursuing § 1983 claims in their lawsuit, the minors contended that the mayor was the final policymaker "in the areas of law enforcement, safety, and social issues; and as a result he had final policymaking authority over the area of conduct that included his abusive acts." *Id.* at 37. On this point, the court noted, a plaintiff must show a municipal official had final policymaking power and that his challenged actions were

6

"within that official's area of policymaking authority." *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988)).

The Second Circuit upheld the grant of summary judgment for the city, reasoning that "[d]ecisions to sexually abuse young children are not made for practical or legal reasons and are not in any way related to the City's interest." *Id.* at 38 (quoting *Anthony v. City of New York*, 339 F.3d 129, 139 (2d Cir. 2003)). This meant that "[t]he City cannot be said to be the 'moving force' behind the abuse." *Id.* (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997)). The court determined that the mayor's actions were "in an area in which he was not a policymaker," so he "had no authority to make policy authorizing, condoning, or promoting the sexual abuse of children." *Id.* at 40.

The Second Circuit also rejected the Fifth Circuit's ruling in *Bennett*: "In our view, *Bennett* cannot be reconciled with *Pembaur* and *Praprotnik*'s prohibition against finding municipal liability based on *respondeat superior*. Consequently, we decline to follow the Fifth Circuit's reasoning with respect to municipal liability under § 1983." *Id.* at 41. It reasoned that "[a]n official acts wholly outside his official policymaking capacity when he misuses his power to advance a purely personal agenda." *Id.*

Next, in *Dahl v. Rice County*, a deputy sheriff filed a claim under § 1983 after a dispute with the sheriff about an unauthorized purchase of badges led to a physical altercation. 621 F.3d 740, 742–43 (8th Cir. 2010). In a meeting to discuss the unauthorized purchase, the deputy alleged that the "sheriff lost his temper" and "struck Dahl in the chest with the heel of his hand, causing Dahl to injure his back." *Id.* at 742

7

(internal quotation marks omitted). The district court granted summary judgment for the county. *Id.* at 741.

The Eighth Circuit recited the legal principles of the municipal-liability analysis, including that "a governmental entity may be held liable if a plaintiff proves that its policy or custom was the 'moving force [behind] the constitutional violation.'" *Id.* at 743 (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). The court further acknowledged that "[a] policy can be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Id.* (citing *Praprotnik*, 485 U.S. at 123). Applying those standards, the court affirmed on grounds that "[t]here is no evidence that this single incident of Sheriff Cook losing his temper represents a policy of Sheriff Cook's or of Rice County's" or that the sheriff or county "maintains a policy or custom of corporal punishment." *Id.* (citing *Pembaur*, 475 U.S. at 483). The court did not cite or discuss *Bennett*.

Finally, in *Doe v. Burleson County*, a clerk in the county attorney's office alleged that the county judge had sexually assaulted her several times, including twice in his office. 86 F.4th 172, 174 (5th Cir. 2023).[2] She brought § 1983 claims against the judge and the county. *Id.* After settling with the judge, the plaintiff went to jury trial against the county. *Id.* at 175. This ended in a mistrial after two jurors conversed with the plaintiff. *Id.* Before the second trial, the court heard argument on whether the judge "had final policymaking authority for purposes of Doe's claim against Burleson County." *Id.* This

---

[2] *Doe* was published on November 9, 2023, after briefing in this case was complete.

8

time, the court concluded that the judge "did not have final policymaking authority for any area relevant to Doe's claim against Burleson County." *Id.* (cleaned up).

On appeal, the Fifth Circuit determined that though the judge had violated the plaintiff's constitutional rights in committing the sexual assaults, the judge "did not possess final policymaking authority in any area relevant to Doe's claim," so it affirmed. *Id.* at 176. The court noted that "[a]n unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Id.* at 176 (quoting *Praprotnik*, 485 U.S. at 123). The court described a final policymaker as "one that decides the goals for a particular city function and devises the means of achieving those goals." *Id.* (quoting *Sweetin v. City of Texas City*, 48 F.4th 387, 392 (5th Cir. 2022)).

The court recited that the judge had "numerous executive, legislative and administrative chores in the day-to-day governance of the county." *Id.* at 177 (quoting *Familias Unidas v. Briscoe*, 619 F.2d 391, 404 (5th Cir. 1980)). The court determined that the plaintiff had failed to show that the judge "possessed the requisite authority as it relates specifically to the alleged sexual abuse" and commented that "it is hard to imagine that [the judge] would be considered the 'ultimate repository of county power' if he engages in independent, private sexual assault against another." *Id.* (quoting *Familias Unidas*, 619 F.2d at 404). Though the plaintiff alleged that the judge summoned her to his office to assist with county business, the court noted that even if he had authority to summon her there, the judge was "engaging in his own independent misconduct, unrelated to his position as County Judge." *Id.* at 178 n.2.

9

The court cited its earlier decision in *Bennett* just once, for the proposition that "[w]hen a final policy maker makes the relevant decision, and when that decision is within the sphere of the policy maker's final authority, the existence of a well-established, officially-adopted policy will not insulate the municipality from liability." *Id.* at 176–77 (quoting *Bennett*, 74 F.3d at 585). Though *Doe* did not explicitly overrule *Bennett*, it did not attempt to distinguish *Bennett* on the facts, either. By my reading, if the Fifth Circuit had applied *Bennett*'s rule to the facts of *Doe*, the Fifth Circuit should have come out the other way and reversed the district court's dismissal of the plaintiff's claims against the county. Because it did not, *Doe* casts doubt on *Bennett*'s continued validity.

## III.    Tenth Circuit Cases of Interest

Though the Tenth Circuit has not until now had occasion to weigh in on a similar case to those discussed above, it has decided cases in which governmental officials have acted outside their realm for personal gratification. In my view, our cases point away from *Bennett*, not toward it.

For starters, in *Starrett v. Wadley*, 876 F.2d 808 (10th Cir. 1989), a former employee in a County Assessor's Office filed § 1983 claims against the assessor and county, premised on sexual harassment committed by the assessor, who was also her supervisor. *Id.* at 811. The district court entered judgment for the County after a jury trial. *Id.*

On appeal, this court considered "whether the County can be held liable under Section 1983 for the Assessor's acts." *Id.* Among the "largely undisputed" facts were

10

these: the assessor "repeatedly made sexual advances toward plaintiff and other female employees, often while he appeared to be intoxicated" and "[t]hose advances included propositioning plaintiff, requesting that she meet him at his house or at other secluded locations, making obscene gestures toward her, and pinching her on the buttocks." *Id.* at 812. We noted that "the jury reasonably could have concluded that [the assessor's] conduct toward plaintiff discriminated against [the plaintiff] because of her sex and thereby deprived her of the right to equal protection of the laws." *Id.* at 815.

We affirmed the district court's finding of county liability for the plaintiff's termination from employment, but we reversed the finding of county liability for the assessor's acts of sexual harassment. *Id.* at 818. We acknowledged that § 1983 municipal liability can occur "for the acts of a municipal official only when the official possesses 'final policymaking authority' to establish municipal policy with respect to the acts in question." *Id.* (citing *Pembaur*, 475 U.S. at 483; *Praprotnik*, 485 U.S. at 123). But we noted that those cases "emphasized that municipal liability is limited to acts that are, properly speaking, acts of the municipality—that is, acts which the municipality has officially sanctioned or ordered." *Id.* (cleaned up). Regarding the sexual-harassment claims, we reversed the district court's denial of the County's motion for judgment notwithstanding the verdict, because the "acts of sexual harassment complained of here were private rather than official acts" and "were personal in nature without any indicia of being 'officially sanctioned or ordered.'" *Id.* at 819–20 (quoting *Pembaur*, 475 U.S. at 480).

11

Finally, in *Lankford v. City of Hobart*, two female dispatchers of the city's police and fire departments sued under § 1983, alleging sexual harassment and discrimination by the police chief. 73 F.3d 283, 285 (10th Cir. 1996). The alleged harassment included "unwelcome sexual advances, obscene remarks, and inappropriate physical touching of their bodies." *Id.* After finding no official city policy favoring sexual harassment, we turned to whether "the official charged with sexual harassment [had] 'final policy making authority' with respect to the acts in question as a matter of state law." *Id.* at 286 (quoting *Pembaur*, 475 U.S. at 483). That left the question "whether [the police chief's] acts can be characterized as a deliberate choice of the city and whether he had final policy making authority for the City of Hobart." *Id.* We affirmed the district court's grant of summary judgment on the city's behalf, reasoning that "[t]his case exemplifies a situation where the defendant was committing private, rather than public, acts of sexual harassment." *Id.* at 287.

These cases all reject municipal liability for the private acts of a final policymaker that are taken outside the realm of that official's duties. So in my view, they point against adopting *Bennett*'s rule.

## IV.    The District Court's Decision

The district court issued a thorough decision accounting for these precedents. It acknowledged that "a county can be liable for the actions of its policymakers, even when those actions violate a previously established policy." *Whitson II*, 2023 WL 2570224, at *4. But the district court wisely noted that "not *every* action by a policymaker is attributable to the entity, which is the implication of the plaintiff's position." *Id.* (first

12

citing *Pembaur*, 475 U.S. at 482 ("[W]e . . . emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish policy with respect to the action. . . ."); then citing *Randle*, 69 F.3d at 448 (municipality may be liable for one-time decision by final policymaker if "the policy decision purportedly made by the official [wa]s within the realm of the official's grant of authority")).

In my view, the district court got it right by concluding that "the transportation of prisoners is within the realm of the county sheriff's policymaking authority" but that the municipality defendants "are not being sued because Mr. Hanna transported Ms. Biggs; they are being sued because he sexually assaulted her. That is not within the policymaking authority a county sheriff has." *Id.* The district court did not err by concluding that Sheriff Hanna's actions were "wholly outside" his authority and lawful realm because he "misuse[d] his power to advance a purely personal agenda." *Id.* (quoting *Roe*, 542 F.3d at 41).

For these reasons I respectfully dissent and would affirm the district court's order granting the motion to dismiss the claims against Sedgwick County. I disagree with the majority opinion's holding that the sheriff can create a municipal policy with his one-time, *illegal*, and *secret* act of sexually assaulting a detainee by interrupting a detainee's jail transport and improperly taking her inside his home to commit a sexual assault. With that as our circuit's new rule, I see no way for a municipality to do anything but write

13

checks—strict liability for the municipality despite its legal inability to constrain a rogue

sheriff determined to gratify his sexual desires.